## THE CERES.

### WESSELS et al. v. THE CERES.

### SYDVENSKA ANGFARTYGS AKTIEBOLAGET v. WESSELS et al.

(Circuit Court of Appeals, Second Circuit. March 17, 1896.)

1. CHARTER PARTY—GUARANTY OF SPEED—"LIGHT LADEN."

A charter party of a steamship for the fruit trade guarantied that she should make a certain average speed in moderate weather, "fruit or light laden." *Held*, that the guaranty was not merely that she could attain that speed at the commencement of the term of hiring, but was a continuing guaranty that the average speed should be accomplished during the term of the charter under the conditions stated, and that "light laden" meant a cargo, the equivalent of a fruit cargo, or one not more cumbersome or more unfavorable to speed. 61 Fed. 701, affirmed.

2. SAME—DAMAGES FOR BREACH.

A guaranty, in a charter party for the fruit trade between Central America and New York, that the steamer shall make a certain average speed, is to be interpreted with a view to the necessity for speed with a perishable cargo; and deterioration of cargo occasioned by loss of time from failure to maintain such speed must be considered as damage in the contemplation of the parties on making the contract. 61 Fed. 701, affirmed. Wallace, Circuit Judge, dissenting.

3. SAME.

The charterers under such a charter party are not to be charged with heedlessness in continuing to run the vessel in the fruit trade after she had failed on several voyages to maintain the guarantied speed, where the owners prevailed upon them not to throw up the contract by promises that the speed should be improved. Wallace, Circuit Judge, dissenting.

4. SAME—"LAY-UP" CLAUSE.

A provision, in a charter of a steamship for the fruit trade, that she "is to lay up for overhauling, two weeks each year, in winter, at time charterers designate," gives the charterers a right to have the vessel laid up annually, without paying hire, for two weeks, in the winter time, for the usual overhauling, but they cannot require her to lay up when all the circumstances show that the pretended lay-up is a subterfuge to evade payment of hire in the meantime. 61 Fed. 701, reversed.

5. SAME—CANCELLATION OF CHARTER—NOTICE.

A provision in a charter party giving the charterers an option to terminate it at any time on giving 30 days' notice, does not entitle the owners to 30 days' notice of a cancellation for breach of a guaranty on their part contained in the instrument.

Appeals from the District Court of the United States for the Southern District of New York.

These were cross libels for damages on a charter party of the steamship Ceres,—the first by Gerhard Wessels and others, the charterers, against the vessel; the second, by the Sydvenska Angfartygs Aktiebolaget, her owner, against the charterers. The district court entered a decree on the first libel in favor of libelants for $7,320.04, and dismissed the cross libel. 61 Fed. 701. From each of these decrees the owner of the ship appealed.

J. Parker Kirlin, for appellants.

Harrington Putnam, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The libelants in the principal libel are importers of fruit in the city of New York, under the firm name of G. Wessels & Co., who, on May 25, 1891, entered into a charter party with the agents of a Swedish corporation which owned the steamship Ceres, for the hire of that ship, by a demise charter, for 4 months from the time of delivery, with the option of continuing the charter for the further period of 12 months, on giving 30 days' notice, previous to the expiration of the first term, and with the further option of canceling the charter party during the extended term upon like 30 days' notice. The charter was extended October 2, 1891. The charter party declared that the vessel had 581 tons net register, and 720 tons dead-weight capacity, exclusive of bunkers, which are of 2 tons capacity, and had about 63–300 feet clear cargo capacity, exclusive of bunkers. At the top of the printed charter party were the words "New York Fruit Form." It was a form used by New York fruit merchants, and contained the following clause:

"The owners guaranty the steamer to make an average speed, under steam, of not less than (11) eleven knots per hour, fruit or light laden, in moderate weather, and with good American coal."

Other clauses indicate that the saving of time was a point of importance, and that the transportation of bananas or other perishable property was in contemplation.

The eighteenth and twenty-eighth clauses are as follows:

"(18) Ship's bottom to be kept properly cleaned and painted, and steamer to be docked whenever captain and charterers may think it necessary, but at least once in every four months, and payment of the hire to be suspended until she is again in proper state for the service."

"(28) Steamer is to lay up for overhauling two weeks each year (in winter, at time charterers designate)."

The steamer was delivered to Wessels & Co. on July 2, 1891, and thereafter made six voyages, which were completed December 4, 1891. She was then sublet to one Vanderbilt for three months, and made one voyage, when she went to Mobile, where Vanderbilt failed, and gave up his subcharter on January 14, 1892. On the same day Wessels & Co. notified the agent of the owners that they wished the steamer to "lay up for two weeks * * * without pay from 17th January." Before the expiration of the two weeks, Wessels & Co. sublet the vessel to a coal company, and she made two voyages, which expired March 22d. She thereafter made, for Wessels & Co., two voyages, called, in the record, voyages 8 and 9, to Colon, for bananas and other freight, and to return with the cargoes to New York. She returned on April 10th.

The first libel, which was filed August 2, 1892, was brought to recover from the ship compensation for the damages which the bananas sustained on these two voyages, by means of her inability to maintain the guarantied speed. The charter was canceled on May 21st, without giving the specified 30 days' notice, upon the ground that she was unable to comply with its conditions. The owners filed a cross libel to recover $1,586, the amount of hire alleged to be due for the two-weeks "lay-up" at Mobile, and for damages, amounting to $244, for the cancellation of the charter without giving 30 days'

notice. The district court decreed, upon the first libel, that the libelants recover $7,320.04, and dismissed the cross libel. 61 Fed. 701. From each of these decrees the owner appealed.

The answer to the first libel, which was filed September 30, 1892, alleged the neglect of the charterers to supply the Ceres with good American coal as the reason for her failure to make an average speed of 11 knots per hour, which failure, during most of the voyages, was admitted. After considerable testimony had been taken, the owner alleged, by an amendment, filed October 10, 1893, that the failure was also due to the fact that the steamer was not fruit or light laden, and that the voyages were not made in moderate weather. The defense in regard to poor coal was practically abandoned during the trial in the district court. These averments are to be read in connection with the construction which the claimant gives to the charter party, and which is that the guaranty of speed was a warranty that, at the commencement of the charter, the Ceres had a capacity of 11 knots under the conditions named, but not that she would continuously maintain it, and that the clause, "fruit or light laden," means laden with fruit, as usually stowed, or with a light cargo, not including any cargo which exceeds in weight such a fruit cargo, and that, under such a construction, the Ceres was too heavily laden. During the last two voyages she was not entirely fruit laden, but had additional cargo.

Upon the construction of the warranty, the vessel was manifestly hired for the main purpose of carrying a very perishable cargo. The clause provides for her speed, not as it existed at the date of the charter, but as it would exist, provided, among other conditions, she was furnished with good American coal. The speed is also to be an average speed, and not one which she can occasionally make. The object of the provision was to guaranty an actual result during the voyages, and not an ability to attain the result at the commencement of the term for which the vessel was hired. We agree with the conclusion of the district judge that the warranty "was intended to be a continuing guaranty that the average speed of 11 knots should be accomplished under the conditions stated," in the absence of any faults of the charterers. The inharmonious testimony of experts, in regard to their definition of the term "light laden," proved that it had no settled meaning, but that its meaning is to be determined from the context, or by the circumstances under which it is used. This being true, we agree with the district judge that its meaning, in the charter party, is "that the ship shall make 11 knots laden with a fruit cargo, or with its equivalent, i. e. when as light laden as with a fruit cargo, or one not more cumbersome, nor more unfavorable for speed." If expert testimony is important, this definition has the support of competent witnesses.

Upon the questions of fact which arose under the guaranty clause, the district court found that an average speed of 11 knots was not maintained, that the charterers never waived their objections on account of the defect, and, further, that they complained of it from the first, and were constantly met by excuses, promises, and hopes of improvement. During the last two voyages, which are the subjects

of these suits, a speed of 11 knots was never attained, even for a day. The only question on this subject, therefore, is whether the conditions of the guaranty were complied with, as respects the weather, cargo, and coal, and whether the failure to make 11 knots is to be ascribed to any fault of the charterers in the loading and trim of the ship. The court further found that the Ceres did not transgress the conditions in regard to amount or weight of cargo, but had less cargo than she was entitled to carry, if entirely laden with fruit, and that she was not loaded too much by the stern. Upon these questions of fact, the failure of the vessel to make the specified average speed, during most of the voyages, was admitted in the answer, and this admission was adhered to in the amendment. As the claimant probably foresaw, it lost nothing by making this admission, for the testimony as to the last two voyages enforced it. In view of the inherent weakness in the testimony for the claimant, in regard to the alleged excessive amount of cargo and improper trim of the vessel, no addition to the comments which the district judge made upon those two defenses is required.

The district judge referred the question of damages to a commissioner, whose careful investigation showed that a large part of the damage which the bananas sustained upon the last two voyages was occasioned by the ship's inability to make the guarantied speed. From the total loss resulting from the decay of the fruit he deducted 20 per cent., as loss which would have resulted if there had been no breach. The district judge added a further deduction of 5 per cent., and, with this modification, confirmed the report. The claimant insists that the damages to the fruit should not be allowed, because they are too remote, and because, before the last two voyages were attempted, the libelants knew that the speed required for the safety of the cargo was impracticable. The important question in this part of the case is whether the damages to the cargo can be regarded as the natural consequences of a breach of the contract which were within the contemplation of the parties, or whether the damages, in the event of a breach, must be considered as confined to the increased consumption of coal, loss of time, and that class of damage. If this guaranty had been contained in an ordinary charter party, by which the vessel was to be used for general purposes, the position of the owners would have been sound, and the guaranty would be construed to have reference to the value of the vessel to the charterers, in respect to economy of time, wages, supplies, hire, and the like general particulars which are immediately connected with the ship itself. But the charter party bore upon its face that it was a form for a fruit charter. The owner, by its agent, and the charterers, understood that the vessel was wanted for a particular use, and the warranty of speed had reference to the adaptedness or fitness of the vessel for that use. The charter party was entered into in view of the necessities of speed in the business in which the vessel was to engage, so that the damage to a perishable cargo, which directly occurred from a failure to make the requisite speed, must have naturally been in the mind and con-

templation of the owner's agent when the contract was executed.

The claimant's next point is that charterers cannot be allowed damages to cargo for a continued breach of the guaranty if they continuously ran the vessel with reasonably certain knowledge that she could not comply with the charter party, and that loss was the certain result; and it is said that it was their duty to use reasonable exertions to make the injury as light as practicable, and not persistently to allow the damages to be multiplied or increased. This proposition is true; but, in this case, the agents of the owner desired that the charter should not be canceled. On November 4, 1891, the charterers notified the agents that the vessel would be returned because she was not up to the guarantied speed. On the next day the agents promised to endeavor to remedy any faults that were not in accordance with the charter party, and requested a withdrawal of the notice of the preceding day, which request was complied with on November 6th. On November 24th the charterers again notified the agents that they might throw up the vessel in consequence of her failure to make the required speed, and the agents requested that they would "allow the matter to stand until the vessel arrived." On December 18th the charterers informed the owner that, from the assurances of the agents and captain they thought that the speed would be improved. After the charter was canceled, the agents write, on May 23, 1892, that the ship is capable of performing the guaranty with proper coal. The continuance of the use of the vessel was not a heedless act, but was at the expressed desire of the agents, and apparently upon their assurances of improved speed.

The cross libel was for the recovery of the hire of the vessel for the half month during which she was laid up at Mobile, and for the loss of £50 sterling by reason of the failure of the charterers to give 30 days' notice of cancellation. The owner insists that, whereas the eighteenth clause provides for a suspension of payment of the hire while the vessel is docked, the twenty-eighth clause does not provide for such suspension while the vessel is being overhauled. The charter party required the owner to maintain the vessel in a thoroughly efficient state, in hull and machinery, and also provided that she was to lay up two weeks in each year for overhauling, and at the time in the winter which the charterers should designate. We agree with the district judge that the latter clause required an annual overhauling of two weeks, and, for the convenience of the charterers, they had a right to designate the time in winter when the lay-up and overhauling should take place; and we also are of opinion that, if the designation was not a subterfuge, and a mere stratagem to evade the payment of hire, such payment was suspended during the lay-up. We are not, however, of opinion that charterers can be permitted to escape payment as the reward of an unfair artifice.

The vessel was sublet, on November 30, 1891, to Vanderbilt, for a period of about three months. He became insolvent, and the vessel reached Mobile about January 5, 1892, with half the hire due on December 23d unpaid. The charterers instructed the cap-

tain not to leave Mobile until that amount, and also the hire to be due on January 8th, were paid. After litigation in Mobile, the hire was paid until January 24th, and on January 14th Vanderbilt surrendered the vessel, in Mobile, to the charterers, who, on the same day, notified the owner's agents in New York that they wished the Ceres to lay up for two weeks from January 17th, without pay. The owner's agents asked permission to run the ship during that time, and perhaps two weeks more, on its account, and were told that the charterers would be willing to make some such arrangement for four or six weeks. This proposed arrangement apparently fell through, because the owner protested against withholding the hire for the two weeks after the 17th. On January 23d the charterers wrote the captain that they regret to lay him up, "but bananas won't pay to run at present, and we are doing same with America." On January 26th the charterers sublet the vessel to W. D. Munson, who took her on February 1st. The vessel had been docked in New York, on December 6th, at the charterers' request, when repairs were made at an expense of about $700 or $800. The charterers had no knowledge whether she needed repairing in January. This pretended lay-up for overhauling was a subterfuge, for the purpose of getting rid of payment of the hire of a vessel which had suddenly come back upon their hands, by shoving her over as suddenly upon the owner.

The claim of the owner that it was entitled to 30 days' notice of the cancellation of the charter party which was based upon and was authorized by a continued breach of one of the vital parts of the contract is without adequate foundation.

The decree of the district court, upon the libel of Wessels & Co., is affirmed, without interest, and without costs of this court, with the exception that the decree of the district court shall be without costs of that court. The decree of the district court, upon the cross libel of the owner, is reversed, without costs of this court, and the cause is remanded to that court, with instructions to enter a decree in favor of the libelants for $1,586, and interest from January 17, 1892, without costs.

WALLACE, Circuit Judge (dissenting). I am of the opinion that the libelants ought not to recover, as damages for the breach of warranty of the vessel's speed, the consequential loss arising by decay and depreciation of the cargo upon the two voyages in question, known as the eighth and ninth voyages. The theory of the libelants is that if, upon these two voyages, the vessel had maintained the contract speed from New York to Colon and back, she would have been able to deliver her cargo of bananas at New York two days earlier than the time when she was actually ready to make delivery, and that, during the two-days delay, the cargo decayed, and became greatly deteriorated in value. By reason of the delay, it has been found that there was a depreciation in the value of the cargo upon the first voyage of $5,624, and upon the second voyage of $5,178. According to the proofs of the libelants, if the vessel had maintained her contract speed throughout her first voy-

age, she would have arrived at Colon on Friday, April 8th, at 3 o'clock p. m.; would have been able immediately to receive cargo; could have sailed the next Saturday night; and could have reached New York, and commenced to discharge, on the morning of April 18th, at which time the fruit was in sound condition; but that, by reason of her insufficient speed, she did not reach Colon until 8 o'clock Saturday evening, April 8th. The next day, Sunday, the negro laborers refused to work. Consequently, she could not load and sail until Monday, April 11th, at noon, and did not reach New York, ready to discharge cargo, until the morning of the 20th, at which time the fruit had decayed. Upon the second voyage, if the vessel had maintained her contract speed, she could have reached Colon, Thursday, May 5, 1891, at 1:15 p. m.; could have loaded and sailed by 9:30 p. m., Friday; could have reached New York, May 14th, at 9:30 a. m., at which time her cargo was in sound condition; and could have been discharged that day. Whereas, she did not reach Colon until 8:30 p. m. of May 5th; arriving at that hour, could not commence loading until Friday morning; could not complete loading and sail until 8 p. m., Saturday; and did not reach New York until May 16th, at noon, at which time the cargo had decayed.

The charter was for four months, with the option to the charterers to renew upon the same terms for a year longer, and contained a condition that they might cancel the contract at any time upon 30 days' notice. Its provisions indicated that the vessel might be employed in carrying fruit cargo, but the charterers were at liberty to employ her in any other kind of transportation, at their pleasure, between ports in Canada or the United States and the West Indies or Central or South America; and they were at liberty to sublet the vessel or assign the charter. The speed warranty was as follows:

"The owners guaranty the steamer to make an average speed, under steam, of not less than 11 knots per hour, fruit or light laden, in moderate weather, and with good American coal."

. Before the charterers exercised their option to renew the charter, the vessel had been unable to make the contract speed. Her owners had insisted that the speed guaranty was inserted in the charter by their brokers without authority from them. Nevertheless, before and after the renewal, they had promised, from time to time, to endeavor to have the speed increased to conform with the warranty. After December, 1891, however, at which time some repairs were made to the vessel, nothing was done or attempted by the owners to increase her speed, and they insisted that they had done all they could, and that the charterers had waived performance. Long before the voyages in question, the charterers understood that the vessel was unable, and was likely to continue unable, to make a higher speed than she actually made upon the two voyages in question. February 5, 1891, they wrote to the owners as follows:

"We note that you consider that we have waived certain clauses of the Ceres charter, and that we shall not run her after March 1st. We do not

know where you got this information, but it is entirely incorrect. We have waived no clauses of the charter, and until you receive proper notice that we shall stop running her, it is not your province to assume that we shall give her up at any time. * * * It is our present intention to continue running this boat, but we must again call your attention that you have guarantied her to make a certain speed, and that we insist that such guaranty shall be carried out. We have, from good feelings towards Capt. Svensson, made no claim for damages, owing to nonfulfillment of this clause, as yet; but it will not be entirely safe to judge, from this, that we will do the same in the future. We have written to you several times on this subject, and do not propose to do so again."

There is no pretense that, from the time that letter was sent, the libelants were under any expectation that the owners would endeavor to increase the speed of the vessel.

The libelants have been awarded damages for a loss which was not such a probable and necessary consequence of a breach of the warranty as may fairly be supposed to have entered into the contemplation of the parties when the contract was made. Such a recovery is not sanctioned by authority. Griffin v. Colver, 16 N. Y. 489. Baldwin v. Telegraph Co., 45 N. Y. 744; Murdock v. Railroad Co., 133 Mass. 15; Pennypacker v. Jones, 106 Pa. St. 237; Howard v. Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500.

If the present warranty had been contained in a charter for a single voyage between specified ports for the transportation of a fruit cargo, a loss caused by a decay of the fruit upon the voyage in consequence of the inability of the vessel to perform her contract might properly be considered to fall within the established rule of damages. But the warranty was contained in a charter which was practically for 16 months, and which authorized the charterers to engage in carrying any kind of cargo, and make a great variety of voyages. The contract was, not that she should make the specified speed under all circumstances, but only that she should do so in moderate weather. The many voyages that might be made during the charter period were subject to contingencies which it was impossible to forecast. The conjectural character of the loss which was likely to occur in case of a breach of the warranty is illustrated by the one which actually took place. Because of 5 hours' delay upon the first voyage in arriving at Colon, the vessel has been made responsible for the consequences of the delay there of 36 hours, and the refusal of the laborers to work. If she had started a day earlier, Sunday would not have intervened. A delay of 30 hours might not have resulted in the decay of the fruit. If the weather upon the voyage had been colder, possibly the delay would not have materially injured the cargo. If it had been hotter, possibly the loss would have been very much larger. And, if the vessel had encountered heavy storms, notwithstanding she had made her contract speed, her cargo might have been ruined by the delay. Whether a cargo of fruit would be injured upon any voyage by reason of the inability of the vessel to make her contract speed would depend upon the condition of the fruit when shipped, the length of the voyage, the weather conditions, and other circumstances which could not be anticipated. When-

ever special or extraordinary damages, such as would not naturally or ordinarily follow a breach, have been awarded for the nonperformance of contracts, it has been for the reason that the contracts have been made with reference to peculiar circumstances known to both parties, and the particular loss has been in the contemplation of both, at the time of making the contract, as a contingency that might follow the nonperformance.

Aside from the objection that the damages which have been awarded are too remote and too speculative, there are graver objections to the recovery. The libelants, having been aware that there was no probability that the vessel would be able to maintain the contract speed, had no right to undertake to transport fruit cargoes upon long voyages, during which a few hours' delay might entail an enormous loss by decay, with the expectation of shifting such loss upon the vessel owners. It was their right to refuse to keep the ship, and rely upon a legitimate claim for damages. Such damages would have consisted in a recovery of the cost of procuring a substituted vessel for the rest of the charter term, and for the difference in value, during the prior period of the charter, between a vessel such as the contract called for and such as they had received. The party injured by the breach of a contract can charge the delinquent with such damages only as, with reasonable endeavors and expense, he could not prevent. It is his duty to use reasonable diligence to reduce the damages arising from the breach as far as practicable. Wicker v. Hoppock, 6 Wall. 94; Warren v. Stoddart, 105 U. S. 224; Bagley v. Rolling Mill Co., 22 Blatchf. 342, 351, 21 Fed. 159; The Oregon, 6 U. S. App. 581, 5 C. C. A. 229, and 55 Fed. 666. Reason and good conscience will not permit him to claim damages which arise in consequence of his own inactivity; still less, with such as arise from his own reckless and improvident conduct. Not content with the experiences of the first of the two voyages in question, the libelants undertook the second with the full knowledge of all the chances which might arise; and, by the judgment of the majority of the court, this experiment has been sanctioned, and the heavy loss which has resulted from it has been shifted from those who undertook the hazards, with the full knowledge of the risks, upon the vessel owners.

I am also of the opinion that, in the absence of any provision in the charter to that effect, the hire was not to cease during the two-weeks lay-up of the vessel; but, as the court has reached the conclusion, upon other grounds, that the appellant is entitled to recover the hire during that period, I do not care to enter upon a discussion of the question.