ANSGAR S. S. CO., Limited, v. WILLIAM W. BRAUER S. S. CO.

(District Court, S. D. New York. February 13, 1903.)

1. ADMIRALTY—RIGHT TO CANCEL CHARTER—FRAUDULENT REPRESENTATIONS.

There are no fraudulent representations as to the capacity of a vessel authorizing the charterer to redeliver her, the charter being negotiated and concluded on the basis of a plan of her contained in a book of plans of vessels, and all statements as to capacity being qualified by notices in the printed descriptions of the vessel, "not accountable for errors in description," and "particulars of steamer believed correct but not guaranteed."

2. SAME—ABSENCE OF BULKHEAD.

Absence of a bulkhead between holds of a steamer is a mere matter of inconvenience, not justifying cancellation of the charter by the charterer, the plan of the vessel on which the charter was made showing no such bulkhead.

3. SAME—VENTILATION OF BRIDGE DECK.

The charterers cannot cancel the charter because her bridge deck was not ventilated, this compartment being intended to be used, ordinarily, for coal space, which the owner was entitled to, and in lieu thereof some of the coal being carried on deck, and the space yielded to the charterer.

4. SAME—BREAKING OF WINCHES.

The breaking down of the winches not affecting the seaworthiness of the vessel, and not requiring sufficient time for repairs to call for a deduction of hire, gives the charterer no right to cancel the charter.

Convers & Kirlin, for libellant.
Warren, Warren & O'Beirne, for respondent.

ADAMS, District Judge. The libel in this action was filed to recover the damages alleged to have been sustained by the libellant, the owner of the Norwegian Steamship Ansgar in consequence of a refusal on the part of the respondent to fulfil the terms of a charter party, dated New York, April 26, 1901.

The charter provided for twenty-four months' employment of the steamship at £1300 per month and went into effect by a delivery of the steamship to the respondent at Philadelphia on the 1st of July, 1901. She made one round trip in the service of the respondent from Philadelphia to Hamburg and return to Philadelphia and thence again to Hamburg, where she was re-delivered by the respondent to the owner on the 30th day of September, 1901.

In justification of such re-delivery, the respondent alleges certain fraudulent representations on the part of the owner in inducing the contract, to the effect:

(1) That the steamship had a greater bunker capacity than was found to be the fact; (2) that she was fitted for the respondent's business of carrying general cargo between Hamburg and Philadelphia, when in fact she was not fit for such service, because she had no bulkheads between the third and fourth holds; because her bridge deck was not properly ventilated and the owner refused to permit suitable ventilation for the carrying of cargo therein, and because her winches were not efficient and broke down when in use; (3) that her average speed was 9½ knots on a consumption of 20 tons of coal per day when in fact her consumption was 31 tons per day.

In further justification of the re-delivery, the respondent alleges subsequent breaches of the charter by the owner in refusing to discharge the captain and the chief engineer for incompetency and misconduct, and breaches of various stipulations about the efficiency of the winches and about continuous service, with full use of vessel.

The respondent also makes counterclaims for money paid by it for the use of the steamship and for damages resulting from various omissions and neglects of the captain.

1. With reference to the bunker capacity, I do not find that the representations claimed by the respondent that the steamer had a dead weight capacity of 6250 tons, including bunkers, were made. It appears that the charter was negotiated and concluded on the basis of a plan of the steamer, contained in a book of plans of Norwegian vessels, which gives the dead weight, inclusive of bunkers, at 6100 tons, and all statements as to the capacity were qualified by notices in the printed descriptions of the vessel, "not accountable for errors in description" and "particulars of steamer believed correct but not guaranteed." There were no representations in this respect which can in any sense be deemed fraudulent.

2 (a) There were no representations with respect to bulkheads which the respondent was entitled to rely upon in justification of cancellation. Like many other Norwegian steamers, there were no bulkheads between the third and fourth holds of the steamer but that constituted no defence to the libellant's claim. The plan of the vessel upon which the charter was made showed no such bulkhead and its absence was a mere matter of inconvenience, at the best, which it was in the power of the charterer to remedy to suit its own purposes. (b) The claim with respect to ventilation of the bridge deck is likewise without foundation. The compartment was not intended to be used, under ordinary circumstances, for cargo but rather for coal space, which the owner was entitled to, in whole or in part, in view of the length of the Hamburg voyage and the provisions of the contract. In lieu thereof, some of the coal was carried on deck and the space yielded to the charterer but no claim could exist because it was not properly ventilated for the carriage of oil, to which it was not adapted. (c) The breaking down of the winches was probably due to improper use by the charterer but in any event the seaworthiness of the vessel was not affected thereby and no cause of damage arose, as the time required for repairs was not sufficient to call for a deduction of hire. (d) The claim of representations respecting speed on a certain consumption of coal is likewise without merit. Even if such representations were made, it appears that they were true in fact when the proper kind of coal was furnished.

The alleged subsequent breaches of the charter are also without merit. It has not been satisfactorily shown that the officers were incompetent or misconducted themselves. The charge is mainly based on the fact that the captain, when on a voyage to Philadelphia from Hamburg, took the vessel into Newport, Rhode Island, when short of coal, instead of seeking it at Halifax or Cape Breton. The economical method of obtaining it was apparently at Newport, as compared with the other places, and the result does not show even

an error of judgment. In any event, the master was responsible for the navigation of the vessel, and if there were fault, it was his fault and not the engineer's and he was subsequently discharged by the owner to meet the wishes of the charterer.

Nor do I find any merit in the alleged counterclaims, which in admiralty would be treated as offsets, excepting as to the coal on board when the vessel was given up and a charge of $78.33 for rope furnished to the steamer at Hamburg. These will be allowed in reduction of the libellant's damages.

It is impossible to avoid the conclusion that the vessel was redelivered to the owner rather because of a falling market, which rendered the contract a burdensome one to the charterer, than on account of any violation of the charter's provisions by the owner.

Decree for the libellant, with an order of reference.