### THE ASTRAEA.

(District Court, E. D. New York. June 20, 1903.)

**1. SHIPPING—LIABILITY OF VESSEL TO CARGO—BREACH OF CONTRACT MADE BY CHARTERER UNDER AUTHORITY FROM OWNER.**

When the owner of a vessel authorizes another, whether he be called a charterer or agent, to engage her cargoes to be carried for hire, what the owner promises the ship shall do in carrying such cargoes that it becomes the ship's duty to do, and it is immaterial, so far as relates to the ship's liability to the cargo for a breach of such duty, that it was imposed by contract rather than by the law.

2. SAME—RULE APPLIED—LIEN OF SUBCHARTERER.
       The owners in a charter party warranted that the vessel would steam
    12 knots, average speed, per hour, under given conditions. The char-
    terer in an authorized subcharter, made with the owners' knowledge
    and acquiescence, repeated the warranty. Cargoes of fruit shipped by
    the subcharterer were injured by decay and depreciation of market
    value through the failure of the vessel to make the warranted speed.
    The owners at all times operated the vessel. *Held*, that the subcharterer
    had a lien on the vessel for the damage sustained.

In Admiralty. Suit in rem to recover for damage to cargo. On
exceptions to libel.

Wheeler, Cortis & Haight, for libelant.
Butler, Notman, Joline & Mynderse, for claimant.

THOMAS, District Judge. The owners in a charter party to the
Tweedie Trading Company warranted that the vessel would steam
12 knots, average speed, per hour, under given conditions. The
charterer, in an authorized subcharter, made with the owners' knowl-
edge and acquiescence, repeated the warranty. Cargoes of fruit
shipped by the subcharterer were injured by decay and depreciation
of market value through the failure of the vessel to make the war-
ranted speed. The owners at all times operated the vessel. Has
the subcharterer a lien upon the vessel for damages? The owners'
agreement contemplated that the charterer would carry its own goods
and contract for the carriage of the goods of others. In such case
the charterer would become a carrier for hire as to third persons
contracting with it, with knowledge of the charter party, while the
owners would remain the actual carriers. The charterer was enabled
to bind the vessel by usual stipulations, and the law imposed upon
the vessel usual duties, and demanded usual qualifications for the
service to which she was devoted. The present warranty of a fixed
speed is not shown to be a usual provision, nor did the law impose it.
The law required that the vessel should have suitable steaming ca-
pacity. The charter party made it definite. The owners measured
their liability in this regard, and warranted its continued existence.
The owners did this, among other things, to induce the charterer to
hire the ship to carry its own goods and those of others. They knew
that the charterer, influenced by the warranty, would trust its own
goods to the ship. They knew that the charterer would use the war-
ranty to persuade others to trust their goods to the ship. They
are presumed to have known that the charterer would incorporate a
similar stipulation in bills of lading and subcharters, and in contem-
plation of law intended that it should do so if it so elected. The own-
ers' representation as to the speed of the ship took the form of a
warranty. It gave persons proposing to send goods by the vessel
notice of the terms upon which the charterer could contract. It
was intended to induce the charterer to trust the ship's specified
speed. It was designed to authorize it to induce others to trust that
speed, and to use the ship relying upon such speed. It stated to the
charterer what it might assure to others; it measured the contract of
warranty which it could make to others; it assured the charterer
to what extent as a carrier it could safely assume liability; and, being

false, it has subjected the charterer to such liability. In few words, it was a promise made, to be used and relied upon by the charterer in carrying its own goods and those of others, and the owners actually operated the vessel and carried libelant's goods knowing that they had authorized the very stipulation pursuant to which the goods could be received for transportation. This authorized the charterer to fix the duty of the ship as to speed. While the charterer contracted with the libelant for its own liability, the owners authorized the charterer to create a duty for the ship, and attached liability to the ship for breach of the duty. Such breach of duty became as much culpable fault as if the law imposed it. When an owner, sending forth a vessel for the carriage of goods for hire, authorizes another, whether he be called a charterer or agent, to engage her cargoes, what the owner promises the ship shall do in carrying such cargoes that it becomes the ship's duty to do. It is immaterial that the owners, rather than the law, impose the duty. The owners made the original contract. They are deemed to have expected that the charterer would repeat the contract with third persons. That is direct authority to do so. But the claimant objects that the personal liability of the owners, and the lien upon the vessel for its fulfillment, are conjoined, and that the charterer's liability to the libelant is not that of an owner nor of one standing in his place. Where there is not a demise of the vessel, it is certain that the charterer and ship may become personally liable, upon an undertaking for the carriage of goods, while the owner is exempt therefrom, provided, as in the present case, "the whole reach of the steamer's holds, decks, and all places of loading" are "at the charterer's disposal." Power of disposal carries rights of ownership and possession. In The Centurion (D. C.) 57 Fed. 412, Judge Brown, with his usual wide and exact learning, stated the law:

"I do not find upon the testimony any evidence of negligence in the management of the ship, for which her owners are responsible, that contributed to this loss. The charterers by the terms of the charter became the owners pro hac vice as respects all matters pertaining to the handling and delivery of cargo, but not as regards the navigation of the ship, for which, under the express terms of the charter, the owners remained the responsible principals. As this loss arose from the improper stowage of the molasses and the extraordinary drainage consequent thereon, and not from any fault in the management of the ship, the charterers are primarily answerable for the loss both of the molasses and of the sugar. The bill of lading in this case was not signed by the master, but by the agent of the charterers. It is on that ground contended in behalf of the ship that she is not chargeable, even secondarily, for this loss; that the shipper and the libelants were put upon inquiry, and were therefore chargeable with notice of the charter and of its special provision that 'no claim was to be made against owners for loss of cargo'; and the analogy of various decisions as regards supplies of coal to chartered vessels is cited in support of this view. I cannot sustain this contention. In the first place, the provision that 'no claim is to be made against owners for loss of cargo' is shown by its context to be nothing more than a stipulation between the owners and the charterers, adjusting their liabilities upon the voyage as between themselves. It has no relation to claims of the shippers of cargo against the ship for any negligent performance of the duties which the law imposes on the ship as a common carrier. The analogy to cases of supplies, moreover, wholly fails in this important particular: that here the ship was let to the charterers for the very purpose of carrying cargo, and, for aught that appears, with the usual mutual lien which the law gives as between ship and cargo. The charter makes the

charterers the owners pro hac vice as respects the transportation of cargo, and by necessary implication authorizes freights upon those usual terms. The charter even expressly provides that the owners shall have 'a lien upon all subfreights.' In the case of supplies of coal by charterers, on the other hand, there is no such authority from the owners, express or implied, to purchase coal on the ship's account, but the contrary. The charter contains nothing that even by implication excludes the ordinary security of a lien in favor of the cargo against the ship for the performance of the ship's duties in the business for which she was chartered. The ship is therefore liable for bad stowage, because the duty to stow properly is one of the duties of carriage which the owner has expressly authorized. The Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341; Niagara v. Cordes, 21 How. 7, 16 L. Ed. 41. The ship is liable for damage from bad stowage whether the stowage is done by the owners' agent or the charterers', and equally so whether there is any bill of lading or not. It was therefore immaterial whether the bill of lading was signed by the master or by the charterers. The Euripides (D. C.) 52 Fed. 161, 163, and cases there cited; The Keystone (D. C.) 31 Fed. 412, 416, affirmed on appeal."

But it may be answered that the duty in that case was such as the owner is presumed to contemplate in leasing his vessel, because it is attached by law to the duty of carriage for hire. But in the case at bar the owners actually did make the agreement with the charterer, and actually contemplated that the charterer would, if occasion arose, transmit the agreement to shippers under bills of lading or subcharters, or, to be more technically accurate, that it would reaffirm the agreement in such instruments. But in the case at bar the owners prescribed their own duty and that of the ship. They promised with what speed the carriage should be made. The law demanded diligence. It required some steaming capacity. The owners fixed the limit of their diligence and such capacity. Surely a self-imposed duty is as obligatory as one imposed by law.

The plain case is that the owners, remaining in possession of the vessel, agreed to transport therein, at a certain speed, such cargo as a second party should engage to carry. The second party personally engaged with another that the ship should carry the cargo at such speed, the contract therefor taking the form of a subcharter. The owners carried the cargo, but at such reduced speed as to ruin or impair it. It is palpable that the owners authorized the second party to represent and to obligate itself, as the apparent owner of the vessel, to transport the cargo at the specified speed. Hence the vessel would be bound as if the owners undertook the carriage, or as if there had been a demise of the vessel. The charterer did stand in the place of the owners for the purpose of its contracts of affreightment. It could assign its charter party, or by subcharter transfer all its rights of use or issue bills of lading. Whether the libelant shipped the goods under a bill of lading, a subcharter, each containing the warranty, or under an assignment of the original charter, such lien accrued upon breach of the warranty. If the charter party had been assigned, he would have maintained his action against the owners and the vessel. The Baracoa (D. C.) 44 Fed. 102. If bills of lading had been issued, the case would have been similar to The Centurion (D. C.) 57 Fed. 412; The T. A. Goddard (D. C.) 12 Fed. 174.

The exceptions should be overruled, with leave to answer.