THE HURSTDALE.

(District Court, S. D. New York. April 26, 1909.)

SHIPPING (§ 51*)—CHARTER—DEFICIENCY IN SPEED—LIABILITIES OF OWNER.

The owner stated in the contract that the vessel would steam 8½ knots per hour on about 17 tons of best Welsh coal per 24 hours, but that the particulars "are not guaranteed." The quality of coal mentioned was not furnished by the charterers. *Held* that the owner was bound by its agents' representations but that in order to entitle the libellants to recover it was incumbent upon them to show that the owner's representations were designedly false and that the libellants relied thereon. Also *held* that the owner had some justification for believing that the statement with reference to speed was true and that the clause containing the words quoted was at least a notice to the libellants not to rely upon it.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 51.*]

(Syllabus by the Judge.)

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty.

Henry W. Rudd and Harrington W. Putnam, for libellants.

Convers & Kirlin, John M. Woolsey, and Charles T. Cowenhoven, Jr., for claimant and respondent.

ADAMS, District Judge. This action was brought by Wessell, Duval & Company against the steamship Hurstdale, and her owner, to recover damages, alleged to amount to $6,000, suffered by reason of the steamer being deficient in speed. She was chartered at a monthly hire by the libellants from the owner by contract dated April 30, 1906, for a round voyage from the United States to ports on the West Coast of South America and return. The contract contained the clause:

"Owners represent that the steamer under ordinary conditions, and laden, will steam on an average about 8½ knots per hour on about 17 tons of best Welsh coal per 24 hours and that her deadweight capacity for cargo and bunkers is about 5,200 to 5,250 tons. These particulars are not guaranteed."

The libel alleged:

"Third: Prior to the execution of said charter-party and also in and by the said charter-party and as an inducement to the libellants to execute said charter-party, the owners of said steamship represented and stated to the libellants that the Hurstdale was a vessel that, under ordinary conditions and when laden, would steam on an average about 8½ knots per hour on about 17 tons of best Welsh coal per 24 hours.

The said representation was a material representation and was made for the purpose of inducing the libellants to execute said charter-party; the libellants had no knowledge of the speed of said vessel except as contained in the said representation in said charter-party and in cable messages from the owners of said vessel to the aforesaid agents, which cable messages were exhibited to the libellants prior to the execution by them of said charter-party, and in reliance upon said representation, the libellants duly executed said charter-party.

The aforesaid representation so made by the owners of the said steamship Hurstdale, was false and untrue and was known by the said owners to be false and untrue when so made. Said steamship Hurstdale was not then a vessel, that, under ordinary conditions and when laden, would steam on an average about 8½ knots per hour on about 17 tons of best Welsh coal per 24 hours.

Fourth: In reliance upon the aforesaid representation, however, the libellants executed the aforesaid charter-party as aforesaid, and on or about the 20th day of May, 1906, said steamship entered upon such charter-party and proceeded on her voyage to the West Coast of South America and return.

Fifth: Said steamer arrived at the Port of Baltimore, U. S. A., on or about the 22d day of December, 1906, on her return from her voyage to the West Coast of South America under said charter-party and the libellants then learned for the first time of the misrepresentation aforesaid.

Sixth: On said round voyage, under the aforesaid charter-party, to the West Coast of South America and return, the Hurstdale steamed on an average only 6½ knots per hour for the entire voyage and, in consequence thereof, was greatly delayed both on her outward and homeward voyage to the libellants' great loss and damage."

The claimant and respondent answered with some admissions and denials and as follows:

"Ninth: Further answering and by way of defence, they allege that the steamship Hurstdale was supplied by the libellants with the coal that was used while the vessel was engaged under the charter above referred to. This coal was of an inferior quality and was not best Welsh coal. Owing to the nature of the business on which the vessel was engaged, on the libellants' behalf under the above mentioned charter and to the manner in which the busi-

ness arrangements of the libellants required that it should be carried on, the vessel's bottom became foul and she did not encounter the ordinary conditions referred to in the charter in connection with which her speed might be ascertained. The owners and officers of the vessel did all that was reasonable and possible to have the voyage of the vessel prosecuted with the utmost despatch and they have duly performed all the obligations resting on them under the above mentioned charter party."

It appears that the steamer was duly delivered to the charterers on the 19th day of May at 7:30 a. m. and was employed under the contract for over 7 months. The question to be determined is whether the libellants are entitled to recover damages for delay in completing the round trip.

The respondent contends that there were no representations made by the owner to the charterers with respect to speed but what was said by the agents of the owner were merely expressions of opinion between them as agents and do not form any basis for the action. The contract was signed "By cable authority from J. Kilgour & Co., Barber & Co., Inc., F. B. Mackay, Agents for Owners." The libellants went into the possession of the vessel under this contract, which was the result of cables between the parties. These cables were shown by Barber & Co. to the libellants before the charter party was entered into and the authority of Kilgour & Co. to negotiate and close the contract has never been questioned. The owner had regularly received and retained the monthly hire. I think therefore that any question of authority on the part of the agents to make the representations may be disregarded and the consideration of the dispute turn upon other matters.

The contract as executed was prepared on one of the regular printed forms used by the libellants in their business of dealing on the West Coast. The form contained the printed clause quoted above excepting the concluding sentence, "These particulars are not guaranteed," which was typewritten.

The steamer's average speed was about 7 knots. The libellants claim that her actual steaming time was 123 days 3 hours, while if she had averaged 8½ knots it would have been only 93 days 4½ hours, therefore it must be concluded that she was in a similar condition when delivered. The libellants were injured by a deficiency in the expected speed of the vessel and the question to be determined is whether the representations of the owner were designedly false and the libellants thereby induced to make a contract which damaged them in such a manner that they were entitled to seek legal redress.

The owner claims that there were in fact no false representations and the steamer in all respects complied with the warranties in the contract. There can be no doubt that the steamer was seaworthy and fulfilled the warranties, unless there was what was equivalent to one in the statement that she would make a speed of 8½ knots. It was not in fact a warranty in view of the wording that the particulars given in the part of the charter covering the speed of the vessel were not guaranteed. It is well understood that in the absence of fraud a statement as to the speed of a vessel, as well as with respect to the quality of an article sold, must be deemed a mere expression of opinion and not a contract of warranty.

The libellants contend that notwithstanding the express disclaimer of any speed guaranty, nevertheless there were false representations made by the respondent. The latter contends that even if the statement, quoted above, and similar ones in the cables preceding the charter, can be considered as representations, the libellants have failed to show by a preponderance of the evidence that they were in fact false. It urges that the apparent loss of speed can be accounted for in several ways:

(a) By an increase in the draft of the vessel, owing to an increased immersion through a new freeboard being granted by Lloyds and permission to load the vessel 6 inches deeper.

It appears that negotiations for the charter took place in the latter part of April, while the new freeboard was granted and permission for deeper loading obtained about May 20th. Therefore the original representations were made before permission was obtained for the deeper loading.

It is true that the figures given show a contemplation that there would be a change in the load line, that is a statement that the dead weight for cargo and bunker was about 5,250 tons, but the owner apparently refused to guarantee this capacity doubtless on account of the uncertainty of the increase. It said in cable of April 25th: "She will carry about 5,200–5,250 but owners will not guarantee capacity." No one knew until after the draft was changed how the vessel would be affected by it. As it resulted, the speed was changed considerably by reason of the change, said to be a knot and a half to two knots an hour, and head seas were encountered continually on the outward voyage, which affected the speed of a blunt vessel.

When the charterers were negotiating for the vessel, they knew of the proposed change and subsequently, in loading, took advantage of it. The master testified that one of the charterer's agents told him before the marks were changed they would not have paid so much for the vessel but upon the understanding that she was to carry more cargo, "have 180 tons more of boat."

(b) The failure of the charterers to supply the steamer with Welsh coal affected her speed.

The cables preceding the contract do not specify the kind of coal but they refer to a consumption of "about 17 tons per 24 hours" which must have meant the "best Welsh coal" contained in the libellants' form of charter.

The first coal supplied by the charterers was received in New York. It was an American—Eureka—coal.

The next was Pocahontas coal received at Norfolk.

In using Pocahontas coal, the best American coal, it is necessary to clean fires twice during a watch, while with Welsh coal one cleaning during that period is sufficient.

When fires are cleaned they are out of commission during the period and after cleaning it takes a certain amount of time to bring them up again to their full capacity. It results in the loss of steam pressure and speed.

Seventeen tons of the best Welsh coal are considered the equivalent of 19 tons of Eureka coal and of 18 tons of Pocahontas coal.

The next coal furnished to the steamer was Coronel, a native Chilian coal. It is very quick burning and requires considerable work with the boilers. It was said that 20 tons of Welsh coal are equivalent to 26 of this, in using which it was necessary to clean the fires 3 times a watch. Its use involved more labor, as larger quantities are required and it leaves more clinkers than the Welsh. This coal was taken on again later and the same trouble encountered with it.

It is not possible to get as good results with inferior coal. It is very exhausting to the firemen in hot climates and difficult for them to do the necessary amount of work to obtain good speed.

(c) The fouling of the bottom of the steamer in the South America trade affected her speed.

She was dry docked and cleaned and painted just before she entered upon this charter. When she returned from the voyage her bottom was very foul, coated with small shell, mussel and marine growths. They were unusual in size, the mussel averaging from 2¾ to 5½ inches in length and grass from ½ to 4 inches in length. It was estimated that these growths caused delay from 1 to 2 knots an hour. There was ample opportunity for the growths to accumulate as the vessel was delayed 14 days at Valparaiso and at Autofogasto nearly a month on account of the congestion of shipping there.

(d) The speed was somewhat affected by weather conditions.

The steamer encountered head seas constantly on the voyage out and while she had good weather on the return voyage, still there was delay on account of the weather. On the 29th of June off the river Plate she was hove to under slow speed for 22 hours. Excepting this instance the weather was good. The master said, however, that he met with "high head seas."

There is no question that the steamer so far as hull and machinery were concerned was in an efficient condition and on this voyage at times she made the stipulated speed. For example, on June 1st, under favorable conditions, she made the rate of 9 knots for 10 consecutive hours and on June 2nd, under the same conditions, she made an average of 8½ knots. And on August 25th and 26th, a speed of from 8¾ to 9 knots an hour was maintained. These records were made with coal inferior to Welsh and with the increased draft due to her marks having been changed.

On other occasions the steamer had made such speed as would, to some extent, justify the owner in believing that she could, under ordinary conditions, maintain an average speed of 8½ knots an hour. Prior to this charter on a voyage from Cardiff to Rio Janeiro, using 17 tons of the best Welsh coal for 24 hours, she ran about 200 miles per day, an average of 8.44 knots per hour. On another occasion, using North Country, or Newcastle, coal, on a voyage from Leith to Rio Janeiro, she averaged 8.7 knots. On a voyage from Calcutta to Colombo, with Welsh coal chiefly, she made a speed of between 200 and 210 knots per day. These voyages were made in 1904 and 1905. These instances were doubtless in favoring weather without any conditions adverse to speed, and probably were the only times she reached the speed mentioned in the contract but still they afforded the own-

er ground for a reasonable belief that she might fulfill such requirement during this contract. In any event, such past performances being known, it can scarcely be said that there was any such wilful misrepresentation of the steamer's speed capacity as would constitute fraud, or give a right to recover damages for fraudulent representations.

When the contract was executed it contained the clause that the particulars mentioned therein were not guaranteed. I think this may fairly be regarded as a notice to the libellants that they should not rely upon the speed mentioned but must look to other sources for exact information, if they required it.

The libel is dismissed.