**DENHOLM SHIPPING CO., Limited, v. W. E. HEDGER CO., Inc.**

**W. E. HEDGER CO., Inc., v. DENHOLM SHIPPING CO., Limited.**

**No. 117.**

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1931.

Roscoe H. Hupper, of New York City, for appellant.

Charles R. Hickox, of New York City, for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The libelant, owner of the steamer Beechpark, chartered her to the respondent on

March 18, 1924, for five months at $1.40 per deadweight ton, the ship to be delivered at Norfolk, or Newport News. The charter contained the usual printed clause that the master should "prosecute his voyages with the utmost despatch," and specially incorporated, typed upon the margin, the following additional paragraph: "In addition to the particulars herein given, steamer is described as capable of steaming about 11 knots to 12 knots an hour in good weather and smooth water on a consumption of about 32 to 34 tons best Welsh coal." She was delivered at Norfolk on April 14, 1924, having been drydocked, scraped and painted during the preceding February. In her bunkers were forty-four tons of Westphalian coal, to which the charterer added at Norfolk 1,467 tons of New River coal, and she made the first leg of the voyage to Galveston in ballast. At that port she lifted a cargo of sulphur for Australia and steamed through the Panama Canal, taking on 322 more tons of New River coal at Colon. At Newcastle, Australia, she took on 217 tons of Newcastle coal, went to Melbourne and Sydney, returned to Newcastle, where she received 1,618 tons of Newcastle coal, and at Adelaide lifted a cargo of grain for Rotterdam, which she reached on October 8, 1924, bunkering en route at Durban, South Africa, with 1,026 tons of coal of about the same grade as Newcastle coal. At Rotterdam she was redelivered.

The charterer reserved part of her hire on the ground that she had broken her warranty, and for this the owner sued. The answer alleged as a defence a breach of the warranty, and the cross-libel was for damages upon the same breach, on the theory that the vessel was not "capable" as declared, and that the hire for the extra time and the added bunkers, required by the default, were a proper cross-claim. The District Judge held that the clause was not a warranty, and had not been broken, if it were. Hence he passed a decree upon the libel, and dismissed the cross-libel. The charterer appealed.

For purposes of navigation 34 tons of the best Welsh coal equals 36 tons of New River coal, and 39 or 40 tons of Newcastle coal. The Beechpark's engine log shows that she burned an average of about 35.5 tons of New River coal from Norfolk to Panama; 34.7 tons from Panama to Sydney; 35.8 from Adelaide to Durban; about 35 from Durban to Rotterdam. The steamer had moderate weather from Norfolk to Galveston, and met strong head winds on only two days while going to Colon. In the Pacific the weather was in general good, and the sea either smooth or moderate. After clearing Norfolk on April fourteenth, until June fifth when she reached Newcastle she had made more than ten and a half knots on only six days. These were April sixteenth and twenty-first, and three hours on the thirtieth, in the Atlantic, and May sixth, tenth and eleventh in the Pacific. During the last three she must have had a favoring current, as her actual distance was greater than her "screw" distance; she had what is called a "negative slip" of the screw, and there is normally a "positive slip" of at least five per cent. This was also true for the three hours' travel on April thirtieth. Therefore the only days on which she could be said to have made about 11 knots unassisted were April sixteenth and twentieth, while en route in ballast from Norfolk to Galveston, and even then she also had a favoring current. These must be excluded from the count, as not within the implied conditions of the warranty.

The owner's position is that the inserted clause was not a warranty at all, and that, if it was, the charterer has not proved a breach, the burden being his. The first seems to us clearly erroneous. The charter, being prepared by the owner's agent, must be construed contra proferentem; the clause, being a typed addendum to the printed form, prepared after negotiation ad hoc, cannot be ignored as a constituent part of the ship's duties. It is impossible to give it any scope, unless it be an undertaking that the charterer may rely upon the description, and that the owner will hold him harmless, if she is not as described  This is all that a warranty means; the failure to use the word, as it was used in The Ceres (D. C.) 61 F. 701, affirmed 72 F. 936 (C. C. A. 2), and in The Astraea (D. C.) 124 F. 83, is unimportant. The definition in section 12 of the Sales of Goods Act (Personal Property Law N. Y. [Consol. Laws, c. 41] § 93), for example, is no more than a statement of the common law, with which the maritime law in this instance should conform: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase." While the decisions differ somewhat as to whether a breach of warranty will justify repudiation of the charter, so far as we know nobody has doubted that a description of a ship's capacity, in speed, as well as in any other respect, when inserted in the body of a charter, will support a suit

for damages. Williston on Contracts, § 1075.

The cases on which the libelant relies are all quite different. In Clydesdale, etc., Co. v. Brauer (D. C.) 120 F. 854, and Ansgar v. Brauer (D. C.) 121 F. 426, the representation was not in the charter, and the charterer tried to rescind for fraud. In Glasgow Shipowners' Co. v. Bacon, 139 F. 541 (C. C. A. 2), there was no warranty of speed, as here. In The Hurstdale (D. C.) 169 F. 912, affirmed 179 F. 371 (C. C. A. 2), the libel was in deceit and the clause was followed by a typed addendum that the particulars were not guaranteed. In The Burma, 187 F. 94 (C. C. A. 2), the libel was also in deceit and the court had refused to allow it to be amended so as to sound in contract. None of these touches the situation at bar.

The meaning of the warranty is however another matter; it spoke from the time of delivery, and was satisfied if the ship was at that time "capable" of making the prescribed speed under the stipulated conditions. It did not follow that she would make it uniformly; that depended upon how she was driven, and whether she had become foul or disabled, even though the conditions were fulfilled. On the other hand, the charterer might assume that it meant something of practical use to him; that it spoke of ordinary service at sea; and it is not relevant whether she later made the required speed under a test by the owner, as apparently she did. We are to inquire whether when laden as intended, she could steam at the stipulated speeds in good weather and smooth seas. If the charterer showed that she could not, he proved a breach, and the best test is what she actually did during the voyage in question on such days as fulfilled the requirements. Indeed, her performance on other voyages, though no doubt relevant, is of less weight.

In fact, the conditions were several times fulfilled before she reached Sydney, and she never made her speed. Thus on April twenty-ninth and thirtieth with a moderate or light wind and a "swell" on the port bow she made less than ten knots; on May second with a light head wind and swell her speed was 10.1; on the seventh she made 9.6 with a light breeze and sea; on the twenty-first, her speed was 9.8 with a light wind and a moderate swell; on June twenty-ninth and thirtieth, it was 10.4 with a light wind and a smooth sea. All these days satisfy the conditions, unless it be supposed that "smooth water" means an absolutely flat sea, which seems to us extreme. But even so, on two days these were literally satisfied, and she did not make ten and a half knots. Indeed with the exception of the last four days the screw speed never quite reached eleven knots.

From Adelaide to Durban on August third with a light wind and a moderate swell she made 9.2, on the fifth, 9.4, and on the thirteenth, 8.5. From Durban to Rotterdam she had a light following wind and sea on August twenty-ninth, when she did 8.8; on September second and third she made nine knots with a light following wind and sea; on the tenth, eleventh and twelfth she had light winds and a smooth sea and made between 7 and 8.8 knots; on the next three days, with light winds and a moderate swell, she never made more than 8.3. In general, the weather she met appears not to have greatly affected her speed.

The owner answers that she may not have been driven, and that "utmost despatch" did not require her to be; her engines may have been "linked in" or throttled, in which case she would not get her full supply of steam, even if the head was kept up. But we are not to suppose that her engine room was wasting the charterer's coal, and such economies must be reflected in the fuel burned. If steam was not used, it was either blown off or not made; the first is not suggested; the second would show in the bunkers burnt. It seems proper therefore to take her consumption as a fair test of her performance, especially as this must have been the charterer's understanding of the warranty. He at any rate could only have supposed that, given the conditions stipulated, she would make the speed with the prescribed tonnage.

We count out the voyage to Colon, the three days in which she did her duty being irrelevant, as we have said. In the Pacific her average of 34.7 New River coal was the equivalent of 32.8 tons of best Welsh coal. It should have brought her speed at least up to "about 11 knots"; it did not at any time bring it to within half a knot of that, and only twice to 10.4. Moreover, this was with nearly a ton more coal than the prescribed limit. To be sure we have only the average consumption on that whole leg of the voyage. She may have burned less on good days than on bad; but the owner had all the facts available and did not suggest this as a reason. On the leg from Adelaide to Durban her consumption of 35.8 tons of Newcastle coal was the equivalent of 30.4 tons of best Welsh coal, and the speeds are, strictly speaking, not relevant either way; the same is true of

the leg from Durban to Rotterdam, on which also she was perhaps not driven. But at no time did she even on good days go as fast as nine and a half knots, and it is at best extremely doubtful whether the consumption of a ton and a half more coal would have added a knot and a half to her speed.

We have assumed in the foregoing that the warranty is to be read distributively, eleven knots on thirty-two tons, twelve knots on thirty-four. It may be argued that this is not the proper meaning, and that the warranty was performed if the ship was capable of steaming eleven knots on thirty-four tons. But the charterer, not the owner, may take advantage of any ambiguities. Moreover, we cannot agree that the clause was doubtful. We agree that it did not deal in small fractions of a knot or of a ton, and we do not so construe it; but to say that it was meant to give the owner the benefit both of the minimum speed and the maximum consumption is in effect to omit the margins prescribed, to make the warranty equivalent to saying that she could steam eleven knots on thirty-four tons. That we cannot accept. Two added tons would perhaps not give her another knot, but it would have been simpler to limit the speed by a maximum consumption, if that had been all that was intended. We can see no reasonable intention but to hold out the ship as "capable" of steaming at about eleven knots on about thirty-two tons. Whether there would have been a breach if she failed to make the added knot with two more tons is possibly open to a doubt, which we find it unnecessary to lay. It is enough that she clearly could not make the minimum; that was a breach. Just what should be the measure of damages we need not now consider; more evidence may come out before the commissioner. It is enough that the respondent has shown itself entitled to some damages.

Decree reversed; cause remanded for further proceedings in accordance with the foregoing.