THE CERES.[1]

WESSELS et al. v. THE CERES et al.

SYDSVENSKA ANGFARTYGS AKTIEBOLAG v. WESSELS et al.

(District Court, S. D. New York. April 7, 1894.)

1. SHIPPING—CHARTER PARTY—GUARANTY OF SPEED—"LIGHT-LADEN."

The charter of a steamship for the fruit trade guarantied that she should make a certain average speed, "fruit or light-laden." *Held*, that the term "light-laden" must be construed in reference to the context, and the vessel was to be deemed light-laden, in respect of draft, if her draft did not exceed that of a full fruit cargo, and in reckoning weight of cargo the weight of so much ballast as would be needed for a fruit cargo should not be counted.

2. SAME—WAIVER OF OBJECTIONS TO LOADING.

Failure of a steamer to make the speed guarantied by her charter cannot be excused by objections to her trim, as loaded by charterers, which were not made by the master at the time of loading, the deficiency in speed having been frequently complained of.

3. SAME—"LAY-UP" CLAUSE.

A clause in a charter of a steamship for the fruit trade stipulated that she "is to lay up for overhauling two weeks each year in winter, at time charterers designate." *Held*, that this assumed the need of overhauling, and the charterers' arrangements as to time therefor, and cessation of pay during such period, could not be defeated by the owners' claim that overhauling was unnecessary.

These were cross libels for damages on a charter party of the steamship Ceres,—the first, by Gerhard Wessels and others, the charterers, against the steamship; the second, by the Sydsvenska Angfartygs Aktiebolag, her owner, against the charterers.

Wing, Shoudy & Putnam, for G. Wessels and others.
Convers & Kirlin, for the Ceres.

BROWN, District Judge. The above libels were brought to recover damages upon a charter party; the first, for non-fulfillment of a guaranty of speed; the second, for charter hire and wrongful termination of the charter. I shall indicate briefly the grounds of my decision upon the points involved.

1. Guaranty of Speed: The charter on its face, and all the circumstances, show that the original hire of the steamer had mainly in view the transportation of fruit cargo. In this business a certain speed is essential, and a knowledge of what is to be counted on is important. The guaranty was, that the steamer should "make

---

[1] Reported by E. G. Benedict, Esq., of the New York bar.

an average speed under steam of not less than 11 knots per hour, fruit or light-laden, in moderate weather, and with good American coal," and the guaranty must be construed with reference to the objects of the charter. The provision that it shall make an average speed shows clearly that it was a practical result that was looked at, and not merely the ship's capacity of attaining 11 knots an hour under the best possible conditions. It was intended to be a continuing guaranty that the average speed of 11 knots should be accomplished, under the conditions stated; not indeed in spite of any faults of the charterers, but that in the absence of any faults or obstacles on their part, the owners should maintain the ship in a state of efficiency to accomplish that average speed.

The evidence leaves no doubt that this speed was not maintained, and that the charterers never waived their objections on account of this defect. They complained of it from the first, and were constantly met by excuses, promises, and hopes of improvement. During the last two voyages, which are the subjects of these suits, a speed of 11 knots was never attained, even for a day. The only question on this subject, therefore, is whether the conditions of the guaranty were complied with, as respects the weather, cargo and coal; and whether the failure to make 11 knots is to be ascribed to any fault of the charterers in the loading and trim of the ship. The excuse grounded upon bad coal was frivolous, as the evidence plainly shows; and as respects the weather, nothing further need be said, than that the steamer did not make 11 knots even when the weather was most moderate and favorable.

2. Fruit, or Light-Laden: The controversy has been chiefly in regard to the loading of the vessel. The case is one in which the words "light-laden" must be construed in reference to the context, and the word "fruit" immediately preceding. See Insurance Co. v. Hamilton, L. R. 12 App. Cas. 490; U. S. v. The Buffalo Park, 16 Blatchf. 190, Fed. Cas. No. 14,681; The Viola, 59 Fed. 635. The meaning is, that the ship shall make 11 knots laden with a fruit cargo, or with its equivalent, i. e., when as light-laden as with a fruit cargo, or one not more cumbersome, nor more unfavorable for speed. Much evidence has been given of the opinions of shipping men as to what the term "light-laden" means. Their diverse opinions, as well as their own testimony, show that there is no standard or custom by which to determine the meaning of the term "light-laden" independently of its context; and I do not think the meaning of the phrase is to be arrived at in that way, or that any fixed proportion of a deep-laden cargo can be arbitrarily adopted. The defendants' witnesses mostly think that two-thirds of a deep, or full load, would be "light-laden." As respects the draft of the vessel, the only limit under this charter, as respects the guarantied speed, is the draft of a full fruit cargo, i. e., the draft with such a full fruit cargo as the vessel was capable of carrying. The charterer had a right to the full fruit-cargo draft; and whatever cargo he puts aboard, if that draft is not exceeded, the steamer must, I think, be deemed "light-laden" within the intent of this charter; and this is the view expressed by several competent witnesses.

The libelant testifies that the Ceres will carry from 24,000 to 30,000

bunches of bananas; and an average weight of these would amount at least to upwards of 350 tons. The dead-weight capacity guarantied by the charter was 820 tons, including coal. On the first of the two voyages in suit, the steamer brought from Colon about 179 tons of bananas, and about 138 tons of merchandise, or 344 tons in all. Besides this, she had on leaving Colon, 225 tons of coal on board, on the first voyage, and 218 tons on the last. As her consumption of coal on the trip from Colon was about 150 tons, the excess of coal for any contingencies of the voyage was 75 tons on the first voyage and 68 on the second. It is nowhere intimated that this was an excessive supply of coal for a purely fruit cargo. The steamer was, therefore, as I must find, weighted down with less cargo than the charterers were entitled to carry for a purely fruit cargo, and therefore did not transgress the condition of "fruit, or light-laden."

3. Trim and Ballast: A further excuse on the part of the ship is, that there was so much weight of coal amidships, with the bananas above, that she was obliged to fill her two forward ballast tanks with water, amounting to 180 tons. I do not perceive, however, that this is material to the question, or that it affects the charterers' rights; for there is no intimation in the evidence that a less amount of ballast would have been needed had the cargo been wholly of bananas. The evidence shows, on the contrary, that upon both voyages, so much of the cargo as was not fruit consisted of heavy merchandise, such as coffee, cocoanuts, etc., all of which were put in the lower hold, rendering less ballast necessary than would have been needed for a purely fruit cargo of bananas. The variation from a purely fruit cargo was, therefore, in favor of the vessel. It was the ship's duty to take what ballast was necessary for a fruit cargo; and the weight of so much ballast as would be needed for a fruit cargo, could not be counted in reckoning what was a "light-lading," any more than it could be counted in a fruit cargo, so far as respects her guaranty of speed. Excluding the ballast, these two cargoes were less even than most of the claimant's witnesses admit to be "light-laden," viz., two-thirds of a dead-weight cargo.

The trim of the vessel, moreover, which is now made a subject of complaint, viz., that she was loaded too much by the stern, is not shown by the evidence to have been objected to by the master at the time. The charterers, or their supercargo, did indeed have the direction of the loading; but as the speed was one of the guaranties of the charter, and the deficiency in speed was frequently complained of, it was the master's duty, if he conceived that the proposed distribution of the cargo would affect the ship's speed unfavorably, to call attention to the subject at the time of loading, when as favorable a disposition of the cargo could have been made as the nature of the case would admit. Not having made any objection at the time when it could have been remedied, such an objection was waived, and the owners are equitably estopped from setting it up now.

It is unnecessary, therefore, to consider the precise details of the draft of the ship, or of the trim forward and aft, about which

there is some conflict in the evidence, and even discordance in the ship's records. It is evident that neither the observations nor the records were made with exactness; and the register of the miles run, as given by the patent log, is still more inaccurate. The Lloyd's deep load-line is immaterial; for even assuming the correctness of the captain's testimony as to the amount of water ballast taken on the two voyages from Colon, viz., 200 tons, of which I have some doubt, still this would make the total tonnage of cargo, coal and ballast on leaving Colon from 80 to 100 tons less than the dead tonnage guarantied by the charter; so that on adding for a full cargo 8 to 10 inches more draft, we should have 16 feet 3 inches or upwards, as the expected draft for the guarantied capacity, even if the mean draft from Colon was 15 feet 9 inches; and this intended draft of 16 feet 9 inches for a full deep-load capacity accords both with the scale delivered by the agents to the charterers, and with her actual draft on the subsequent voyage to Spain. The defendants cannot appeal to the Lloyd's deep load-line as any excuse for non-compliance with the agreements and representations of the charter. The evidence indicates that the boilers and pipes were not in perfect condition, and that the chief engineer, for that reason, forbore "to drive the ship as in other trades." Whatever the reason, however, it seems to me clear that the ship did not make the guarantied speed under the agreed conditions; and that the libelants had the right both to terminate the charter, as they did, for this breach, and to recover such damages, if any, as arose from it.

4. The Lay-Up Clause: The language of this clause is not that of a mere option. Section 18 requires docking at least once in every four months, during which hire shall cease. I think the intent of section 28, declaring that the steamer "is to lay up for overhauling two weeks each year in winter, at time charterers designate," was to give the charterers the right to designate the two weeks in winter when the vessel should be off pay, so as to suit the exigencies of their business; that this was also for the further purpose of securing perfect efficiency of the steamer during the subsequent months when she would be wanted to make as quick speed as possible; that the need of such overhauling in winter is assumed by the charter, and that the charterers were bound under the charter to expect, and therefore had the right to count on, an overhauling at such time during the winter as they should designate, and upon a cessation of pay during this period; that the owners could not defeat the charterers' arrangements as to the time for this overhauling and cessation of pay, by the claim that overhauling was unnecessary; and that the evidence does not prove that overhauling was unnecessary, but rather indicates that the subsequent two or three weeks' work upon the ship could have been done at the time designated by the charterers, with improvement in her service.

A decree may be entered in accordance with this opinion, and an order of reference, if the damages are not agreed on.