## THE GEORG DUMOIS.

(Circuit Court of Appeals, Second Circuit. February 28, 1902.)

### No. 51.

SHIPPING—CHARTER PARTY—MEASURE OF DAMAGES FOR BREACH.

Under the rule that damages for breach of contract must be confined to those which naturally and directly result from such breach, or may be fairly presumed to have been within the contemplation of the parties when the contract was made, where the owner of a steamer, under a time charter to convey cargoes of bananas from Port Limon to New York, under which a number of voyages had been made, had knowledge of and acquiesced in a custom of the charterer to have a cargo cut and ready to load in anticipation of each arrival of the steamer, and on one outward voyage the vessel was delayed by reason of unseaworthiness, for which such owner was responsible, until on her arrival the cargo was unfit to ship with safety, the charterer is entitled to recover the value at Port Limon of the cargo so lost, and such other loss as directly resulted from the delay; but the charterer was not entitled to load the cargo with knowledge of its condition, and ship the same to New York, and recover as damages the loss by deterioration on the voyage, and in addition a sum which it would have earned as freight for the voyage, under a contract with the third party, if the cargo had been delivered in good condition.

Appeal from the District Court of the United States for the Eastern District of New York.

J. Langdon Ward, for appellant.
Lawrence Kneeland, for appellee.

Before WALLACE and LACOMBE, Circuit Judges, and TOWNSEND, District Judge.

TOWNSEND, District Judge. The facts which are material upon the question of liability herein are not disputed, and are accurately stated as follows in the opinion of the judge who heard the cause in the court below (88 Fed. 537):

"On the 20th day of July, 1895, the libelants, as copartners, under the firm name of Ellinger Bros., entered into a charter party for the charter of the steamship Georg Dumois for six months or more, in case of a renewal, at a price named per month. It was stipulated that the vessel, with her full complement of officers, seamen, engineers, and firemen, should be delivered at Port Limon, 'ready to receive cargo, and being tight, staunch, strong, and in every way fitted for the service,' which was the carriage of merchandise and passengers between ports in North America and ports in the West Indies, Central America, and South America. The charter party further provided: '(1) That the owners shall provide and pay for all provisions, wages, and consular shipping and discharging fees of captain, officers, engineers, firemen, and crew; shall pay for the insurance of the vessel; also for all engine room and deck stores; and maintain her in a thoroughly efficient state, in hull and machinery, for and during the services, guarantying to maintain the boilers in a condition to bear the working pressure of at least 60 pounds (and this pressure to be carried continuously) during the whole term of this charter. * * *' '(4) * * * That the captain shall prosecute his voyages with the utmost dispatch. * * *' '(7) That, in the event of loss of time from deficiency of men and stores, break-down of machinery, or damage preventing the working of the steamer for more than twenty-four hours at sea, the payment of hire shall cease until she be again in an efficient state to resume her service; * * * also if any loss of time from crew or stores

115 F.—5

not being on board in time, or from repairs to hull and machinery, which are for owners' account, not being complete after cargo and coals are on board and hour of sailing has been fixed by charterers, and notice given to captain, the time lost is for the steamer's account. (8) * * * The act of God, the enemies, fire, restraints of princes, rulers, and people, and all other dangers and accidents of the seas, rivers, machinery, boilers, and steam navigation throughout this charter party always excepted.' '(12) * * * That, on account of the perishable nature of the cargoes that this steamer is intended to carry, she is not allowed to stop to pick up any wreck, or in any way assist or tow any vessel, especially when by so doing she is liable to be detained only in order to save human life.' The charter party also provided as follows: 'It is understood [that the] steamer is built for banana trade, has steam pipes, side ports, large ventilators, holds lined with charcoal, fruit decks, saloon on deck amidships,' etc. Previous to the voyage involved in this action, the vessel had made ten trips under the charter party between New York and Port Limon, according to a practice whereby she left the former port on Wednesday, arrived at the latter port on Friday of the following week, leaving on her return trip on Saturday, and arriving at New York on Monday or Tuesday morning of the second week following. On Wednesday, July 15, 1896, the vessel left New York. On July 21st, two stay bolts, extending between the combustion chamber and the back of the boiler, and intended to prevent a collapse of either, were leaking so that the water came out into the fireroom."

Thereupon the steamer proceeded on her voyage. The opinion then states as follows:

"The vessel remained at Barracoa until 5 o'clock on the morning of Friday, July 24th, making necessary repairs, and then sailed, arriving at Port Limon at noon on the following Monday, July 27th. While at Port Limon one or two of the stay bolts, one of them not of those repaired at Barracoa, began to leak, but such bolts were reported, and the vessel was loaded and ready for sea at 1 o'clock on Tuesday afternoon, July 28th, but was detained by libelants' agent waiting to ascertain whether the cargo could be carried to New Orleans, which it could not be on account of the quarantine. But on Wednesday, July 29th, at 10 a. m., the vessel sailed for New York. Some of the stay bolts leaked on the way to New York, but her passage in point of time was somewhat better than the outward time. The length of the voyage from New York to Port Limon was two days and thirteen hours longer than the longest voyage, and three days and fifteen hours longer than the shortest voyage, the vessel had previously made between these ports. The period of variation between her longest and shortest voyage was one day two and a quarter hours. To economize time, the charterers had been in the habit of telegraphing to Port Limon the date of the probable arrival of the steamer there, and thereupon the shippers of bananas would have the green bananas cut and carried down to the wharf so as to be there on the arrival of the vessel, it being necessary that the bananas should be shipped green to prevent their ripening too much on the voyage to New York. That course was pursued in this case, and on the arrival of the vessel the bananas, which had been on the pier awaiting her arrival for three days, were not fit to be sent to New York, and would not stand the trip, of which the libelants were advised by telegraph, and the captain protested that he could not be accountable for them. The libelants increased the delay, as above stated, by some hours, in an effort to ascertain whether the ship could not go to New Orleans, but was finally ordered to New York. Upon the arrival at such port it was found that a very large part of the bananas was unmarketable. It is for the loss of these bananas and deterioration in price of the others that this libel is brought."

We concur in the opinion of the district judge that the inspection was insufficient, and that the vessel was unseaworthy at the commencement of said voyage, and that the owners were liable for damages resulting therefrom. But we are unable to assent to the view

taken as to the measure of damages which resulted in holding the owners liable for the loss occasioned by the deterioration in the bananas on the homeward voyage, and for the charge of $2,000 freight for said voyage under a contract with a third party. Damages in such a case must be confined to those which naturally and directly result from the breach of the contract, or may fairly be presumed to have been within the contemplation of the parties when the contract was made. Griffin v. Colver, 16 N. Y. 489, 69 Am. Dec. 718; Baldwin v. Telegraph Co., 45 N. Y. 744, 6 Am. Rep. 165; Murdock v. Railroad Co., 133 Mass. 15, 43 Am. Rep. 480; Pennypacker v. Jones, 106 Pa. 237; Howard v. Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147.

In the case at bar it may be assumed that the claimants, by reason of their knowledge of, and acquiescence in, the custom inaugurated subsequent to the making of the contract, of cutting bananas in anticipation of each arrival, were chargeable for the loss, through unseaworthiness of the steamer, of bananas so cut. But on Monday, before the steamer reached Port Limon, libelants' agent there had cabled them that the bananas would be lost if the steamer remained out any longer, and after her arrival he cabled again that "the bananas were not fit any more to be sent to New York; they would not stand the trip;" and asked "whether we would send the bananas to New Orleans." Thereafter, on Tuesday, the libelants cabled their agents to wait till they had telegraphed to New Orleans, but, finding that the steamer could not go there on account of quarantine, they finally cabled their agents to send the bananas to New York. Acting under these instructions, libelants' agents loaded the fruit on board the steamer. The captain filed a written protest with the American consul against the loading of the fruit or damages on account of its condition.

That the steamer was delayed by leakage on her homeward voyage is immaterial, because, inter alia, such delay did not affect the time of unloading the cargo. Nor is it material that on the day before the vessel arrived the cargo was found to be in comparatively good condition. The duration of the return voyage was not in excess of the average, and was only 10 hours longer than the quickest voyage made, and the court has found that during this voyage no act was done, no omission suffered, no defect existed, that caused the injury. The vessel arrived at quarantine at about quarter past 2 on the morning of August 7th, and it is admitted that it would have made no difference if she had arrived on the preceding afternoon.

The single question presented is as to the rights and obligations of the parties in view of the situation and events during the time the steamer was at Port Limon. Upon its arrival on Monday the bananas were confessedly unfit for shipment. The libelants, however, insisted on loading the bananas on board on Tuesday. The master of the steamer reported that he was ready to sail at 4 o'clock on said afternoon, but libelants' agent refused to allow him to depart before he (the agent) heard where the steamer was going to, and, finally, at 9 o'clock on Wednesday morning, said agent ordered

him to sail for New York. It is not clear why this delay of 18 hours was not in fact the direct cause of the damages for which this ·suit is brought. But libelants should not be held responsible therefor, because said delay was due to an attempt on their part to minimize the damages which had already resulted from the unseaworthiness of the vessel. Failing, however, in this attempt, what was the further duty of the libelants, forty-eight hours after the ripe bananas had become unfit for shipment? It was not their duty or within their rights to insist upon the bananas being carried to New York, to arrive there a putrid mass, only in order that they (the libelants) might claim the contract compensation of $2,000 for a worthless freight, and damages by reason of further deterioration on said unjustifiable voyage. The libelants, whose claim to the $2,000 rests only on their contract with a third party, could not by such unauthorized shipment burden this cargo with a charge of $2,000 imposed by their wrongful act. Nor could they thereby acquire a greater interest in said cargo. It is clear that a party in fault cannot be thus subjected to increased liability for damages by such an unwarranted act. It was the duty of libelants to make such further efforts as may have been practicable to make the damages as light as possible.

What was, then, the measure of libelants' damages? Under the familiar rule, it was the value of the property lost at the time of the breach, and such other loss as has directly resulted to the party injured by reason of said breach. In the case at bar this would be the value of the bananas cut at Port Limon, which is shown to be $2,726.50, and such damage, if properly pleaded, as might accrue to libelants by the loss of the use of the vessel during the period in which libelants were engaged in securing a new cargo of bananas. What the amount of such damage resulting from delay might have been does not appear, and no such damages are alleged or claimed under the libel or its amendment. The only damages claimed were for the deterioration in said cargo of bananas. It nowhere appears that the claimants had any knowledge as to the stipulation with a third party for the payment to libelants of $2,000 per voyage, nor is there any allegation of loss of freight, by reason of the terms of said contract, for $2,000.

After the decision of the question of liability and reference to a commissioner, the libelants amended their libel as owners of the cargo so as to claim as consignees for the owner, the Compania de Bananera, to whom the libelants had made advances on the value of the cargo. It appeared on the hearing before the commissioner that there was a written agreement between said Compania de Bananera and another company, La Tropical, who were shippers, that fruit should only be loaded·on Fridays or Saturdays, and upon 15 days' notice to La Tropical. This contract, however, is nowhere referred to in the evidence, and appears, from the record and from a letter written by one of the libelants to his counsel, to have been introduced merely to refresh the recollection of the witness, and correct his testimony as to the cost of bananas and freight by railroad. It is not shown that the provisions referred to had ever been

communicated to claimants, or had ever been in force, or that any attempt was made by libelants to ascertain whether any arrangements could have been made for securing a new cargo, nor how much time would have been gained or expense involved in so doing. There is no evidence to show whether a new cargo could have been procured in 3 days, or whether the charterer would have been obliged to wait 15 days for such new cargo. It is manifest that the libelants suffered loss in addition to that occasioned by the deterioration in the value of the bananas. But, inasmuch as there was no evidence from which the amount of said additional loss could be ascertained, no damages can be awarded therefor in this action.

The decree is reversed, and the cause is remanded to the court below, with instructions to enter a decree for libelants in the sum of $2,726.50, with interest from July 28, 1896, and for claimants for the costs of this appeal.