# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### THE FORT MORGAN.

### FT. MORGAN S. S. CO., Inc., v. BALTIMORE & JAMAICA TRADING CO.

(Circuit Court of Appeals, Fourth Circuit. October 21, 1922.)

No. 1965.

1. **Shipping ⬅137—Liability for errors in navigation.**
   Harter Act, § 3 (Comp. St. § 8031), exempting ship and owner from liability for loss resulting from faults or errors in navigation, if due diligence has been exercised to make the ship seaworthy and properly manned, equipped, and supplied, should be strictly construed, where exemption is claimed for losses due to stranding, through gross negligence of the engine force.

2. **Shipping ⬅53—Breakdown clause of charter party not applicable to negligent stranding.**
   The "breakdown" clause of a charter party does not affect the liability of the owner to the charterer for loss due to negligent stranding.

3. **Shipping ⬅53—General exception clause in charter party not applicable to loss through negligence.**
   The general exception clause in a charter party, excepting from liability for loss through act of God, accidents at sea, etc., is available only to a party free from negligence.

4. **Shipping ⬅53—High degree of care required under fruit trade charter.**
   Under a time charter for the West India fruit trade, at a high rate of hire, for carriage of highly perishable fruits, a high degree of care and diligence is required of the vessel, and she is liable for losses caused by gross negligence of officers or crew.

5. **Shipping ⬅43—Charter for fruit trade subject to known custom as to preparing cargo for loading.**
   A time charter for carriage of West India fruits, largely bananas, under which the ship was required to load at different points, is subject to the known and necessary custom to have the banana cargo at each point cut and ready for loading when the ship arrived, and where through a negligent stranding she failed to arrive at such points until several days after due, and in consequence the fruit which had been cut was damaged or spoiled, the ship is liable for the loss.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

284 F.—1

**6. Shipping ☞58(3)—Ship liable to charterer for cost of replacing fruit cargo jettisoned on negligent stranding.**

Where a chartered ship, after loading part of a cargo of fruit at Jamaica, was negligently stranded, and the cargo was jettisoned, she is liable to the charterer for the cost of fruit bought to replace such cargo.

**7. Shipping ☞58(3)—Ship held liable for damage to fruit cargo.**

Where through negligent stranding a ship chartered for carriage of fruit from the West Indies was late in arriving at loading ports, with the result that the fruit awaiting shipment had deteriorated, but such as was thought fit was loaded, the ship *held* liable for the loss through its further deterioration on the voyage.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty by the Baltimore & Jamaica Trading Company against the steamship Fort Morgan; the Ft. Morgan Steamship Company, Incorporated, claimant. Decree for libelant, and claimant appeals. Affirmed.

For opinion below, see 274 Fed. 734.

Wallis Giffen and Lee S. Meyer, both of Baltimore, Md. (Bullowa & Bullowa, of New York City, on the brief), for appellant.

John Henry Skeen and James Morfit Mullen, both of Baltimore, Md., for appellee.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

WADDILL, Circuit Judge. The libel in this case was filed by the Baltimore & Jamaica Trading Company, the appellee herein, against the steamship Fort Morgan, of which the appellant, the Ft. Morgan Steamship Company, Incorporated, is claimant. The parties will be referred to as libelant and respondent.

The libelant had its principal office in the city of Baltimore, and was engaged in the importation of tropical fruits, principally bananas, from the island of Jamaica. In January, 1920, the claimant, the Ft. Morgan Steamship Company, as agents for the owner, entered into time charter with the libelant for the steamship Fort Morgan, for the period of about nine months, at $18,000 per month. The charter was on the regular West Indian fruit form, and provided, among other things, for the carriage of merchandise between any port or ports in the United States of America and the West Indies, for use in the libelant's business. The ship was to be properly equipped and fitted for use in that service, as provided in the charter. It was warranted that the Fort Morgan was tight, staunch, strong, and in every way fitted for the service, with a full complement of officers, seamen, engineers, and firemen; that notwithstanding the charter, in matters respecting the vessel's navigation, she was to be under the direction and control of its customary officers. It was also provided that a supercargo or representative of the charterer should be carried on board, as is customary in handling cargoes of this precarious character, and that as respected the location, ventilation, and care of the cargo, the officers of the ship would take directions from the supercargo. The ship made

its initial trip to Jamaica, and returned with a cargo of bananas taken from several stopping places on the island.

On her second voyage, the stranding the subject of this litigation occurred. Prior to starting on her voyage, in accordance with the usual practice, the libelant's agents in Jamaica were duly notified of the probable time of arrival of the ship at the several shipping points, so that they could procure the cargo in advance of her arrival; it being the custom to cut the bananas some 48 hours before the ship arrived at the several points of shipment, and place them on the wharf or landing place, so that they could be promptly put on board. It was necessary for a full cargo to get the bananas at seven or eight different places on the northern shore of Jamaica, covering a distance of about 140 miles, and the ship's itinerary was arranged in advance, so as to make the several landings at specified dates, and take up the cargo in the order of the stopping places. On the voyage in question the Fort Morgan reported 4 hours late at Port Maria, where she picked up stevedores and surf boats, and proceeded to Green Island, the first point of call, and took on board 1,500 stems of bananas. She then proceeded easterly down the island to Lucia, the next point of call, and upon entering the harbor in the customary way, about 8 o'clock p. m. on April 14th, the anchor was dropped on 15 fathoms of chain, and an order given by the pilot for full speed astern, apparently for the purpose of tautening the anchor chain. This order of full speed astern the master telegraphed to the engine room, and the order was repeated back as given. For some unaccountable reason, the ship, instead of going astern, went full speed ahead, dragging her anchor until she stranded on a mudbank some 200 fathoms distant, ramming the bank so hard that, before she could be pulled off, it became necessary to discharge the coal and water, and the bananas; two whole days and nights being taken for the purpose. The vessel was not able to proceed on her journey until 3:45 p. m. of April 18th, with the result that, although she should have left Port Antonio, the last point of call, at 10 a. m. on April 15th, she did not do so until 2 a. m. of April 21st, more than 5½ days late.

In anticipation of the ship's arrival, 24,629 stems of bananas had been accumulated at various points along the northern shore of the island. By reason of the highly perishable nature of the cargo, a considerable portion thereof was lost entirely, and other large portions depreciated in value. As before stated, the custom was to cut the fruit 48 hours in advance of the arrival of the ship, according to its itinerary, which was done in this case, and with the delay in arrival of more than 4 additional days the losses the subject of this litigation were incurred.

To complete the cargo, the libelant purchased all the bananas that could be procured, to take the place of those wholly unfit for shipment, causing those of doubtful value, by reason of their decayed condition, to be shipped by rail promptly to a nearby point, but which proved ineffectual, as they were too greatly depreciated, even for the short shipment. Libelant used every effort to take the residue of the bananas believed to be fit for shipment to Baltimore at the quickest speed and

least loss. On arrival there it became necessary to dispose of the cargo immediately at the best price that could be obtained for it.

Libelant asserted a claim for $23,533.85. Respondent denied all liability for the alleged negligence in the navigation of the ship, or for any loss or damage resulting therefrom, under the terms of the charter party, and claimed that under the provisions of the Harter Act (Comp. St. §§ 8029–8035) the ship was exempt from liability in the circumstances. The District Court denied the claim of exemption from liability, and held the ship liable for the losses arising from the stranding of the vessel, not in the full amount claimed, but in the sum of $17,387.-25. The Fort Morgan, 274 Fed. 734. This court will pass upon the correctness of the several rulings, as well as the amount assessed against the ship.

First. Was the stranding of the ship caused by the negligence of its officers? The lower court, after a full consideration of this question, and hearing the evidence, much of which was taken in open court, decided in favor of the libelant, with which finding we are in entire accord. The whole circumstances demonstrate that the accident could only have happened as it did by the grossest negligence, or the utter ignorance, of those controlling the ship's movements in her engine room.

[1] Second. The District Court denied the claim for exemption from liability of the respondent under the Harter Act; the court's conclusion being that the ship had failed to meet the burden imposed upon it by the exercise of proper care in procuring its engine room force, and on account of whose gross negligence the stranding was caused. We also concur in this view. The act in question undoubtedly exempts from liability, where a shipowner has conformed to its requirements in making the vessel seaworthy, by the exercise of due diligence to properly equip, man, provision, and outfit it; but the terms of the act should be strictly construed as against a shipowner seeking exemption from liability, if he has failed to comply with its provisions. Harter Act, 27 Stat. 445 (Comp. Stat. §§ 8029–8035); The Edwin I Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823, 38 L. Ed. 688; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 386, 26 Sup. Ct. 467, 50 L. Ed. 794; Hughes on Adm. (2d Ed.) pp. 182, 190; 36 Cyc. p. 28.

[2] Third. The respondent seeks exemption from liability under the seventh clause of the charter party, familiarly known as the "breakdown" clause. Does this section avail as a defense under the circumstances of this case? Manifestly it does not, and the authorities cited in support of the contention, on careful analysis, will be found not to apply. The purpose of the clause is what its name denotes, viz. to guard against losses arising from breaks in machinery and similar accidents at sea, preventing the working of the steamer, which in this case provided for a suspension of the charter hire after 24 hours' delay, until the voyage was resumed. It has no relation to damages such as arose here, resulting from the negligence of the navigating officers in stranding the vessel in making a landing. The Craigallion (D. C.)

20 Fed. 747, 748; The Georg Dumois (D. C.) 88 Fed. 537; Scrutton on Charter Parties (10th Ed.) p. 382; Poor on Charter Parties, § 113.

[3] Fourth. Respondent further seeks exemption from liability under the eighth paragraph of the charter, known as the "general exception" clause, viz. exemption by reason of the "act of God, the king's enemies, fire, restraint of princes, rulers and people, and all other dangers and accidents at sea, rivers, machinery, boilers and steam navigation." This clause in charter parties is well understood as applying to cases arising from "perils of the seas," and those seeking relief under this provision must themselves be free from fault. Hughes on Adm. (2d Ed.) p. 165, aptly states the rule as:

"Accidents incident to navigation which are unavoidable by the use of ordinary care, and are the sole proximate cause of the loss. * * * The accident from which a carrier is exempted under this clause must arise independently of his acts. If his negligence co-operate, the carrier is responsible."

Where the loss arises from the gross negligence of those navigating the ship, as found here, this claim to exemption does not apply. It is well settled both under American and English authorities, that the clause is merely equivalent to "perils of the seas." Liverpool & G. W. S. Co. v. Phoenix Ins. Co. (The Montana) 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Campania, etc., v. Brauer, 168 U. S. 104, 18 Sup. Ct. 12, 42 L. Ed. 398; The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234; The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; Baxter v. Leland, Fed. Cas. No. 1,124, affirmed Fed. Cas. No. 1,125; Wright v. W. R. Grace & Co. (D. C.) 203 Fed. 360; The Jeanie, 236 Fed. 463, 149 C. C. A. 515; Herman v. Compagnie Gen. Trans., 242 Fed. 859, 155 C. C. A. 447. The British authorities make this doctrine equally clear. Magnus v. Buttemer, 11 C. B. 876, 21 L. J. C. P. 119; Thomas v. Whitmore, 3 Taunt. 227. A careful examination of the authorities cited by the respondent, upon their facts and circumstances, will be found not inconsistent with the views herein stated.

The judge of the District Court made a separate finding on the subject of damages, in which he allowed $17,387.26, made up as follows:

"The replacement cost of the bananas lost in Jamaica, either by being thrown overboard or having decayed: Taking one of the low estimates of the cost of such bananas, I find that this item amounts to $6,436.07. The other is the depreciation in the value of 8,500 bunches, about one-third of the entire cargo, which were brought to Baltimore, but, because of the length of time which had elapsed between their cutting and their arrival in Baltimore, were worth very much less than had they arrived in sound condition. This item amounts to $10,951.18."

The damages thus assessed include three elements, viz.: (a) For loss arising from jettisoning part of the cargo; (b) for the cost at Jamaica prices for replacing bananas so badly deteriorated as not to be in condition to load on the ship; (c) depreciation in the value of fruit believed to be in condition to be shipped to Baltimore. The last two items of damage involve the question of whether liability therefor exists against the ship under the charter, and incidentally its liability

for bananas cut and placed in readiness for shipment in advance of the arrival of the vessel. These questions will now be considered.

[4] The ship's liability under the charter party for losses arising from the negligence of its navigators seems too plain to admit of serious doubt, in the light of the court's rulings upon the several special defenses interposed and hereinbefore passed upon. It is manifest, as well from the charter party as the respondent's action thereunder, including the fitting up of the vessel as provided for in sections 11 and 12 of the charter party, and the high rate of charter hire of $18,000 per month, that it was well understood that the ship was to be used in the fruit trade between Baltimore and the West Indies, and in the transportation of highly perishable fruits, chiefly bananas. The form of charter party used was headed "Time Charter—West India Fruit Trade." A special speed of 11 knots an hour was guaranteed, and the perishable nature of the cargo was especially emphasized in clauses 11 and 12 of the charter, whereby arrangements were provided for keeping the cargo cool; for the suspension of the use of the donkey engine during the voyage, and inhibition against stopping to aid vessels in distress, unless for the preservation of human life. That a high degree of diligence was required on the part of the respondent, as well in the matter of the vessel's equipment, as in the selection of its officers and crew charged with its navigation, is free from doubt; and when, as found in this case, the disaster occurred by reason of the gross negligence of the ship's officers and crew, accompanied by the failure to use due diligence in procuring and furnishing such officers and crew, the ship is liable for losses thereby sustained. The Ceres (D. C.) 61 Fed. 701; Id., 72 Fed. 936, 19 C. C. A. 243; certiorari denied 163 U. S. 706, 16 Sup. Ct. 1199, 41 L. Ed. 319; The Georg Dumois (D. C.) 88 Fed. 537, Id., 115 Fed. 65, 52 C. C. A. 659; The Southwark, 191 U. S. 1, 8, 11, 24 Sup. Ct. 1, 48 L. Ed. 65.

[5] Considering the liability for the loss of fruit cut in advance of the ship's arrival that proved wholly worthless, or was depreciated in value because of delay in the ship's arrival caused by its negligence, will depend upon the contract between the parties in reference to such cutting and loading of the cargo on the ship, within the true intent and meaning of the undertaking between them. Undoubtedly the known custom as to the time of cutting and the manner and method of loading prevailing at the time will control. The modern authorities make this view clear, if, indeed, there was ever any doubt about it. Counsel for the libelant cite The Curlew, a decision of this court, 55 Fed. 1003, 5 C. C. A. 386, as apparently sustaining their contention as to the damages arising from cutting in advance of the ship's arrival. The opinion of the District Court regarding this and subsequent cases shows that the decision in that case should not be followed here, as it was predicated upon cutting fruit in advance of the ship's arrival, in direct conflict with the custom to delay cutting until then.

Here the custom to cut in advance of the ship's arrival, with a view of prompt loading, and the manner and method of placing the cargo at the landing in readiness for quick transfer on shipboard, was thoroughly understood and known to all, and was made necessary by rea-

son of the ship's having to stop at seven or eight different landings along the northern shore of the island of Jamaica, covering some 140 miles. It was impracticable to await the arrival of the ship before getting the cargo together, and the effort to do so under modern methods of shipment would have resulted in the loss by decay of the first lots of fruit taken on board, before the last could be loaded. The custom respecting this trade in the particulars mentioned is as well understood as the law fixing the liability of the parties is settled, in the circumstances. The cases last cited of The Georg Dumois (D. C.) 88 Fed. 537, and Id., 115 Fed. 65, 52 C. C. A. 659, supra, on appeal, and The Ceres (D. C.) 61 Fed. 701, 72 Fed. 639, 19 C. C. A. 243, on appeal, and 163 U. S. 706, 16 Sup. Ct. 1199, 41 L. Ed. 319, supra, fully sustain these positions. Carver on Carriage by Sea (6th Ed.) pars. 183, 184; Scrutton on Charter Parties (10th Ed.) pp. 22–24; Eddy v. Northern S. S. Co. (D. C.) 79 Fed. 361; Continental Coal Co. v. Birdsall, 108 Fed. 882–885, 48 C. C. A. 124. See also Bulkley v. Naumkeag Steam Cotton Co., 24 How. 386, 16 L. Ed. 599; Oakes v. Richardson, 2 Low. 173, Fed. Cas. No. 10390; Scott v. The Ira Chaffee (D. C.) 2 Fed. 401; The J. C. Stevenson (D. C.) 17 Fed. 540; The Alvah (D. C.) 59 Fed. 630, on appeal 77 Fed. 315, 23 C. C. A. 181: Petersburg Line v. Peanut Co., 172 Fed. 321, 324, 96 C. C. A. 383, 24 L. R. A. (N. S.) 569 (Fourth Circuit). The last cited cases bear more particularly upon the right of the lien in rem against the ship.

[6, 7] In conclusion, the libelant's right of recovery for the amount assessed by the District Court seems clear, viz. for the cost of the bananas purchased at Jamaica prices to take the place of those jettisoned, as well as those unfit for shipment, as far as the same could be procured, in order thereby to minimize the damages as much as possible (The City of Para (D. C.) 44 Fed. 689; The Georg Dumois, 115 Fed. 65, 68, 52 C. C. A. 659; Steger v. Orth, 258 Fed. 619, 170 C. C. A. 73; The Mary F. Barrett [D. C.] 270 Fed. 618, 624), and for the sale value of the cargo at Baltimore, transported in the belief that the same was fit for shipment, and as to the preservation of which due care was exercised en route (Railroad Co. v. Estill, 147 U. S. 591–616, 13 Sup. Ct. 444, 37 L. Ed. 292; City of Para (D. C.) 44 Fed. 689; The Georg Dumois, 115 Fed. 65–68, 52 C. C. A. 659; U. S. S. Co. v. Haskins, 181 Fed. 962, 104 C. C. A. 426.

The measure of damages, as stated in the Haskins Case, supra, 181 Fed. 965, 104 C. C. A. 429, is:

"The difference between the market value of the cargo at the time and place of delivery in the condition in which it would have arrived, but for the carrier's fault, and its market value in the condition in which, by reason of such fault, it did arrive, with interest from the time of delivery."

The decision of the District Court will accordingly be affirmed, with interest from the date of the decree appealed from, and costs.

Affirmed.