## ALUMINUM CO. OF AMERICA v. FEDERAL TRADE COMM...

(Circuit Court of Appeals, Third Circuit. June 24, 1924.)

No. 2721.

**1. Monopolies ⬳24(2)—Evidence held not to show creation of fraudulent indebtedness in order to acquire assets of another company.**

On application by Federal Trade Commission for modification of a decree affirming Commission's order requiring A. Co. to divest itself of its stock in R. Co., so that decree may enjoin A. Co. from acquiring any of the physical assets of R. Co., evidence of an indebtedness resulting from A. Co. selling aluminum ingots to R. Co. for 32 cents a pound not to show creation of a fraudulent indebtedness, though A. Co. charged aluminum ingots to its subsidiary, of whose stock it owned 100 per cent., at uniform figure of 18½ cents a pound, during a period of great changes in prices.

**2. Monopolies ⬳24(2)—That company had been required to divest itself of stock in another company held not to prevent collection of bona fide debt.**

That A. Co. had been required, under Clayton Act, § 7 (Comp. St. § 8835g), to divest itself of its stock in R. Co., *held* not to prevent A. Co. from collecting a bona fide debt, in any manner provided by law, though it involved acquisition of physical assets of R. Co., now ... ent.

On Petition of the Federal Trade Commission to Amend a Previous Decree. Petition denied.

For former opinion, see 284 Fed. 401.

William H. Fuller, of McAlester, Okl., and Edward L. Smith, of Washington, D. C., for Federal Trade Commission.

George B. Gordon and S. G. Nolin, both of ▮tsburgh, Pa., for Aluminum Co. of America.

Francis W. Treadway, of Cleveland, Ohio, for Cleveland Metal Products Co.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge [1] Upon facts stated at length in an opinion reported at 284 Fed. 401, this court sustained an order of the Federal Trade Commission commanding the Aluminum Company of America, on a finding that it had violated section 7 of the Clayton Act, 38 Stat. 730 (Comp. St. § 8835g), ... self of all its stock in the Aluminum Rolling Mills Company, a company having an aluminum sheet-rolling plant at Cleveland, Ohio. Of the stock of this company the Aluminum Company owned $400,000 and the Cleveland Metal Products Company owned $200,000 par value. The Commission's order provided against sale of the stock to any person or corporation in any way related to the Aluminum Company but expressly permitted sale to the Cleveland Company, the logical and, in the circumstances, ... only possible purchaser. The Aluminum Company eyed the order by selling its stock to that company. The purchase price was $1,000 but, as the Cleveland Company had lost about $200,000 in the venture, the Aluminum Company, in addition, promised to reimburse it to an amount equal to one-half of its losses, not to exceed $100,000.

After compliance with the order of the Commission, this was the situation: The Cleveland Company owned all the stock of the Rolling Mills Company. The latter company had never made money. Indeed, it is wholly insolvent and its plant has been shut down for some time. Thus the Cleveland Company found itself in possession of a nominal asset with which it did not know what to do. Desiring aluminum sheets as a raw material in the manufacture of aluminum cooking utensils, the Cleveland Company had embarked in the business of rolling sheets at the outbreak of the war and made money at mounting prices for its surplus product. But upon the entrance of the United States into the war prices receded and the spread between the cost price of ingots and the selling price of sheets grew so small that it began to lose money. Thereupon the Aluminum Company appeared and with the Cleveland Company organized the Rolling Mills Company and engaged in the undertaking which the Federal Trade Commission found violated section 7 of the Clayton Act in that it substantially lessened competition, restrained commerce and tended to create a monopoly. But now the Cleveland Company is out of the business of manufacturing aluminum cooking utensils; it no longer has need of aluminum sheets and has definitely determined never again to re-enter the aluminum industry. Therefore it has neither need nor place in its business for the plant of the Rolling Mills Company. In consequence it must either hold the plant, at growing costs, until it can find some use for it or sell it on a low real estate market. This is the situation as it bears on the Cleveland Company. As it bears on the Aluminum Company the situation is different but none the less acute. It is this:

The Rolling Mills Company is indebted to the Aluminum Company in approximately the sum of $600,000 upon four promissory notes representing the unpaid balance due the Aluminum Company for aluminum ingots and pig aluminum purchased during the operation of the plant. It is conceded that the Rolling Mills Company is insolvent. Nothing else being in sight, the Aluminum Company now proposes to bring suit on the notes and after judgment, levy on the plant and bid at the sheriff's sale. Of this intention it frankly informed the Federal Trade Commission. As the indebtedness is greater than the value of the plant, the Aluminum Company will inevitably acquire the plant for its indebtedness.

In the light of these undisputed facts the Federal Trade Commission, conceiving the proposed action of the Aluminum Company to be violative in principle of all that has been done, filed a petition asking this court to modify its decree by which it affirmed the order of the Commission (requiring the Aluminum Company to divest itself of its stock-holdings in the Rolling Mills Company) so that the decree may extend to and enjoin the Aluminum Company, its officers, subsidiaries, and affiliated companies. from acquiring any of the physical assets of the Rolling Mills Company.

The Commission grounds its petition for modification of the decree upon a fact—sharply disputed—that "the alleged indebtedness claimed by the Aluminum Company of America against the Aluminum Rolling

Mills Company was created in violation of law; that it is entirely fictitious; that it is merely book indebtedness, and created for the purpose of claiming that the plant of the Aluminum Rolling Mills Company was unprofitable; and brought about for the very purpose of the indebtedness becoming the basis for a judgment to enable the Aluminum Company of America to acquire the plant at execution sale and thereby become the owner of 100 per cent. of said plant rather than 66⅔ per cent. as theretofore," and maintains that "to permit the (Aluminum Company) to carry out its proposed action and buy the physical assets of the Aluminum Rolling Mills Company would be to allow the (Aluminum Company) to defeat the plain intent of section 7 of the Clayton Act, and (it would) constitute a plain and direct evasion of the order of the Federal Trade Commission, which, having been affirmed by this court, has now become the decree and judgment of this court."

In a word the contention of the Commission is that the indebtedness in question is wholly fictitious and therefore fraudulent, and, being fraudulent, it cannot be used to evade the former decree of this court or to do indirectly what section 7 of the Clayton Act prescribes shall not be done.

From this relatively brief summary of a long petition it is clear that the question in this phase of the controversy turns on the character of the indebtedness, whether bona fide or fraudulent. On this issue a reference was ordered and much testimony taken. To this testimony we have given full and careful consideration. It being quite impracticable to discuss the testimony at length in this opinion, we shall do no more than give its trend and state our conclusions.

The fact basis of the alleged fictitious and therefore fraudulent indebtedness of the Rolling Mills Company to the Aluminum Company, created, as claimed, for the purpose of ultimately obtaining the plant, is the price at which from time to time the Aluminum Company sold aluminum ingots to this ostensibly independent concern by comparison with prices at which it sold the same product to its subsidiaries. In this connection the first important thing is the origin of the Rolling Mills Company, the purchaser. This corporation was organized on February 15, 1918. It began business on March 20, 1918, under the stock and operative control of the Aluminum Company. A few days before, namely, on March 8, 1918, and necessarily before any transactions of sale between these corporations had taken place, the War Industries Board fixed the price of aluminum ingots at 32 cents a pound and aluminum sheets at forty cents a pound. At these prices the Aluminum Company sold ingots to the Rolling Mills Company and the Rolling Mills Company sold sheets to the trade. Moreover, the Aluminum Company sold ingots to everyone except its subsidiaries at this price, or at prices changed from time to time by the War Industries Board until February 28, 1919, when government price control ceased. The narrow spread between the purchasing price for ingots and the selling price for sheets used by the Rolling Mills Company, though it is probable that so far as there lo ses extended to the Aluminum Company they were offset by profits of that concern in

the sale of ingots. But this alone did not amount to fraud. Transactions of purchase and sale of aluminum ingots between the Rolling Mills Company and the Aluminum Company ran into millions of pounds. Payment was made for most and the four notes in question were given for the balance. These notes were given on different dates through a period of three years; one after the Commission had begun investigating the aluminum situation and three after the Commission had issued the complaint in this case against the Aluminum Company. Having kept clearly in mind the distinction between the acquisition of stock of one corporation by another, the effect of which is substantially to lessen competition and to restrain commerce (the issue involved in the main case), and the issue here whether the indebtedness in question is bona fide or fraudulent, we have not thus far discerned fraud.

But the Commission finds fraud not in the sale price for ingots per se but in comparison with the price at which the Aluminum Company sold ingots to the United States Aluminum Company. This corporation is a subsidiary of the Aluminum Company of whose stock it owns 100 per cent. and to this concern it billed ingots during this period at 18½ cents per pound. Assuming that within these figures there was a profit, the Commission points to fraud on the part of the Aluminum Company in building up a large indebtedness on the price of thirty two cents charged the Rolling Mills Company when the price charged to another company was the smaller figure and urges also a violation of the decree of the District Court of the United States for the Western District of Pennsylvania, entered by consent in an action by the United States against the Aluminum Company enjoining that company from discriminating in prices between persons to whom it shall sell crude aluminum. We pass by the latter point for, if substantial, it is a matter solely for the court whose decree is charged to have been violated. We are concerned only with discrimination by which an alleged fraudulent indebtedness has been built up. Was there discrimination amounting to fraud or was there discrimination at all? That depends upon the story of the figures 18½ cents.

These figures first came to view in 1912 and appeared as charge entries for ingots delivered to a fabricating subsidiary of the Aluminum Company. They have persisted without change from that date to the time in question. According to the testimony these figures did not, nor were they intended to, include profits. Neither did they fluctuate with the market. This is clearly shown by their lack of change through a period of great changes. Rather, they were static figures, arbitrarily selected, by which to gauge economy and efficiency in the fabrication for which a semi-raw material was consigned and charged. They represented nothing more of profits and losses than the letter X, but were employed, like other figures, as a fixed and unvarying transfer price in intercorporation transactions running from ore to the finished product. Real profits and losses were reflected only in the consolidated balance sheet. This is the trend of the evidence and was, in our opinion, the purpose and meaning of the price which the Aluminum Company charged its subsidiary, the United States Alu-

minum Company, for ingots. If we are right in this, the discrimination on which the Commission has built its charge of fraud falls out of the case. Without going into details, it will be sufficient to say that we have not been convinced that the Aluminum Company, looking years into the future, fraudulently created an indebtedness "for the very purpose" of taking advantage of a situation which it had all the while been fighting to prevent and which no one could reasonably conceive would arise.

[2] Finding on this record that the indebtedness in question is not fraudulent, can this court amend its decree by restraining the Aluminum Company from proceeding in any manner provided by law for the collection of its debt? Certainly not unless empowered so to do by the Clayton Act, the source of its jurisdiction in this case. The seventh section of that Act under which the Federal Trade Commission made its findings and this court affirmed its order concerns lessening of competition and restraint of trade. These we apprehend are issues no longer here involved. The Cleveland Company, the one stockholder of the Rolling Mills Company, has definitely withdrawn from the industry. The Rolling Mills Company is, in a competitive sense, dead. The plant is a shell rapidly falling into decay. It is however the only thing out of which a creditor, at one time offending against the Clayton Act, can recover what appears to be a bona fide debt. Does the Clayton Act, in a case like this, thus nullify other laws and deprive such a creditor of the right to resort to them? We have found nothing in its terms which indicates that it does.

Grounding our decision solely on the inability of the Federal Trade Commission to establish fraud in the indebtedness on which the Aluminum Company proposes to seek recovery at law in another court, we are constrained to deny its petition to amend the decree previously entered.